# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CONTOUR DATA SOLUTIONS LLC<br><br>Plaintiff,<br><br>v.<br><br>GRIDFORCE ENERGY MANAGEMENT LLC, NAES CORPORATION, CDW CORPORATION, CDW DIRECT, LLC, JOHN AND JANE DOES 1-5, and ABC COS. 1-5<br><br>Defendants. | Civil Action No. 2:20-cv-03241-CMR |

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiff, Contour Data Solutions LLC ("Contour"), by and through its undersigned counsel, Troutman Pepper Hamilton Sanders LLP, hereby files this Second Amended Verified Complaint against Defendants, Gridforce Energy Management LLC ("Gridforce"), NAES Corporation ("NAES"), CDW Corporation and CDW Direct, LLC (collectively, "CDW"), John and Jane Does 1-5 ("Doe Defendants"), and ABC COs. 1-5 ("ABC Defendants") (collectively, "Defendants"), and in support thereof avers as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because this action, in part, arises under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), the Federal Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*), and the Federal Stored Communications Act (18 U.S.C. § 2701 *et seq.*). This Court may exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 since these claims are closely related to the federal claims so as to form the same case or controversy.

2.     This Court has personal jurisdiction over Defendants because Defendants transact business, contract to supply things, and/or cause harm and tortious injury in the Commonwealth of Pennsylvania. Defendants have purposefully availed themselves of the laws of Pennsylvania and engaged in continuous and systematic conduct in Pennsylvania and this judicial district.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.     Contour is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with a principal place of business at 4259 W. Swamp Road, Suite 301, Doylestown, Pennsylvania 18902.

5.     Upon information and belief, Gridforce is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 1301 Fannin Street, Suite 1000, Houston, Texas 77002.

6.     Upon information and belief, NAES is a corporation organized under the laws of the State of Washington with a principal place of business at 1180 NW Maple Street, Suite 200, Issaquah, Washington 98027.

7.     Upon information and belief, CDW Corporation is a corporation organized under the laws of the State of Delaware with a principal place of business at 75 Tri-State International, Lincolnshire, Illinois 60069.

8.     Upon information and belief, CDW Direct, LLC is a limited liability company organized under the laws of the State of Illinois with a principal place of business at 75 Tri-State International, Lincolnshire, Illinois 60069 and is a wholly-owned subsidiary of CDW Corporation.

9.     Upon information and belief, Doe Defendants are individuals, past or present, who received or used the Confidential Information and Trade Secrets referenced herein and described

more specifically below. The Doe Defendants will be identified in the course of discovery and substituted as party defendants for the Doe Defendants.

10.     Upon information and belief, ABC Defendants are legal entities, past or present, that received or used the Confidential Information and Trade Secrets referenced herein and described more specifically below. The ABC Defendants will be identified in the course of discovery and substituted as party defendants for the ABC Defendants.

## FACTUAL BACKGROUND

### CONTOUR

11.     Contour is one of the fastest growing technology companies in the Delaware Valley region, servicing an array of industries and businesses by deploying enterprise-based technologies in secure cloud experiences.

12.     Contour works closely with its clients to identify the client's goals, budget constraints, technology integration issues, and problem areas to develop and build an information technology ("IT") strategy and entirely unique system for that client.

13.     Whether the client requires cloud solutions, a managed services suite, or integration services, Contour is nationally recognized and respected as being at the forefront of this technology field.

### GRIDFORCE

14.     Upon information and belief, Gridforce provides energy control and integration management services to electric micro-grids, load-serving entities, and demand response clients in North America.

15.     Gridforce is a wholly-owned subsidiary of NAES.

**NAES**

16.     Upon information and belief, NAES provides construction services to the power generation, oil and gas, and petrochemical industries.

17.     NAES is a wholly-owned subsidiary of ITOCHU Corporation. Upon information and belief, ITOCHU Corporation ranks among the world's largest corporations.

18.     Upon information and belief, NAES generates approximately $1.09 billion in sales annually.

19.     Upon information and belief, NAES acquired Gridforce in/around July 2017.

20.     Upon information and belief, NAES has maintained and continues to maintain significant control over Gridforce's financial, day-to-day, and long-term obligations, including those related to Contour.

21.     Following NAES's acquisition of Gridforce, all invoices issued to Gridforce by Contour were paid by NAES.

22.     All discussions and inquiries concerning such invoices were between Contour and NAES's Accounts Payable Department, not with Gridforce.

23.     Following NAES's acquisition of Gridforce, NAES migrated Gridforce's Microsoft Exchange Email to NAES's Office 365 Tenant.

24.     Upon information and belief, despite being identified as "Gridforce employees" following NAES's acquisition of Gridforce, Gridforce employees were and are, for all intents and purposes, managed, paid, and controlled by NAES and were and are consequently NAES employees/agents.

**CDW**

25.     Upon information and belief, CDW is a worldwide technology company that sells

- 4 -

hardware, software, and technology solutions to businesses of all sizes.

26.     Upon information and belief, for the twelve (12) months ending in June 2020, CDW ranked No. 191 on the Fortune 500.

27.     Upon information and belief, NAES has been a longtime customer of CDW.

28.     Upon information and belief, change orders and statements of work issued to NAES for the "lift and shift" described *infra* were issued by CDW Direct, LLC.

### DOE DEFENDANTS

29.     Upon information and belief, the Doe Defendants are individuals that enjoy a working relationship with Gridforce and have obtained or used the Confidential Information and Trade Secrets described herein from Gridforce during the course of that working relationship.

### ABC DEFENDANTS

30.     Upon information and belief, the ABC Defendants are legal entities that enjoy a working relationship with Gridforce and have obtained or used the Confidential Information and Trade Secrets described herein from Gridforce during the course of that working relationship.

### CONTOUR'S CONFIDENTIAL INFORMATION AND TRADE SECRETS

31.     In 2013, James Thompson, then-President of Gridforce, approached Contour, seeking to enlist Contour's services in building an entirely original IT system, from the ground-up, for Gridforce – essentially, an IT network and system to permit Gridforce to operate its business as a utility company whilst satisfying regulatory requirements.

32.     At the time of Contour's engagement, Gridforce had absolutely no IT system or infrastructure; Gridforce retained Contour to create an entire IT system from and by which Gridforce would run its business.

33.     As the energy industry is one of the most tightly and closely regulated industries

in the world, the technical, security, accessibility, reliability, and various other requirements provided by Gridforce to Contour concerning what the IT system to be authored/created by Contour must be able to do (and not fail to do) were extensive and complicated.

34.     Confident in its abilities and the skill and expertise of its highly-trained and specialized technicians and engineers, Contour entered into a Managed Master Services Agreement (the "MMSA") with Gridforce on June 27, 2014. (Exhibit A.)

35.     Over the course of a year and thousands of man-hours, Contour's experts designed, created, and authored an entirely original IT system to meet each of Gridforce's requirements.

36.     Creating an original IT system like the one required by Gridforce was not a simple, one-size-fits-all endeavor, particularly because Gridforce did not supply Contour with any templates for the construction of the IT system, and provided only one Excel spreadsheet identifying Gridforce employees by name and job title, as well as only one USB containing Gridforce-specific data and information that Gridforce wanted allocated to each employee.

37.     Contour therefore had to purchase all software, licenses, and hardware, and use its expertise and proprietary techniques to create a unique and entirely original IT configuration specifically suited to address each of Gridforce's specifications.

38.     Specifically, using its specialized and proprietary techniques, Contour designed, built, and configured multiple original, complex, and very sophisticated IT networks and firewalls, an extensive structure of interfacing servers and databases – including but not limited to the creation of all user accounts and groups, firewall rules, home directories, and folder mapping – a fault tolerant disaster recovery platform, and all backup technologies.

39.     The creation of Gridforce's IT system required Contour to author tens of thousands of lines of copyrightable/copyrighted computer source code, scripts, and rules. This material was

entirely original – created only by Contour for use only by Gridforce – and unique, and was the heart of the Gridforce system. Without this copyrightable/copyrighted Contour work product, the software, licenses, and hardware Contour purchased for use in the Gridforce system were virtually useless; it was only through Contour's authorship and implementation of its proprietary designs and techniques that the Gridforce system was brought to life (the techniques used, original system designed and created, and copyrightable/copyrighted material authored collectively referred to herein as Contour's "Confidential Information and Trade Secrets").[1]

40.    The production environment for Contour's Confidential Information and Trade Secrets, i.e., the setting where Contour's Confidential Information and Trade Secrets were actually put into operation for use by Gridforce, was Reading, Pennsylvania.[2]

41.    Because the work required of Contour was so extensive and the deployment of the system so intricate, Contour purposely negotiated the contract price and provisions of the MMSA to ensure that Contour would retain the rights to its Confidential Information and Trade Secrets and that Gridforce's use of the same would only be in accordance with and pursuant to the MMSA – including the fulfillment its obligation under the MMSA to pay monthly for its use of Contour's Confidential Information and Trade Secrets – and not after the MMSA expired or was terminated.

---

[1] In the simplest terms, the software, e.g., Windows, etc., used in the Gridforce IT system (or any similar large-scale IT system) is only the smallest and most basic building block of the IT system. Without the original network design, mapping, source code, rules, and scripts (among other things) created and authored by Contour, the IT system has no idea what it should (or should not) do, has no security, has no ability to communicate with connected computers, and is essentially rendered useless. Another company may have looked at Gridforce's original IT system requirements and designed an altogether different IT system than that created by Contour, writing different source code, scripts, and rules. For that reason, the techniques used, original IT system designed and created, and copyrightable/copyrighted material authored by Contour is proprietary, confidential, and copyrightable/copyrighted material and trade secrets. A list identifying Contour's Confidential Information and Trade Secrets is attached hereto as Exhibit B.

[2] All of the Confidential Information and Trade Secrets in the Contour-created Gridforce IT system resided in Reading as a "hot copy" of the Confidential Information and Trade Secrets master set that lived in Salt Lake City, Utah, i.e., a live version of the IT system that was continually checked, updated, etc. In August 2019, Reading became the location of the master set after it was switched from Salt Lake City. Thus, during the life of the MMSA and at all relevant times, Gridforce continuously accessed and used Contour's Confidential Information and Trade Secrets while such Confidential Information and Trade Secrets resided in Reading, Pennsylvania.

42.     In other words, the MMSA – specifically, Section 6(a) of the MMSA – explicitly states that Contour's Confidential Information and Trade Secrets are proprietary in nature and belong entirely to Contour, and that, upon conclusion of the parties' relationship, Gridforce retains only the data it supplied to Contour and was housed in the IT system. The MMSA specifically requires that Gridforce must cease using and return all Contour Confidential Information and Trade Secrets upon expiration or termination of the MMSA. (*See* Section 6(a) of Exhibit A.)

## THE MMSA

43.     The MMSA is a "master" form of contract, meaning it permits the parties to contract for multiple services without having to renegotiate the terms and conditions set forth in the MMSA.

44.     To that end, the MMSA governs the entirety of the parties' agreement, while various other documents, referred to as Service Order Forms or "SOFs," were issued each time Gridforce requested an additional and new item of work stemming from the MMSA.

45.     Similarly, pursuant to the MMSA, a Billing Change Request was issued if any changes were made or requested by Gridforce that would impact either the terms of a particular SOF or the billing associated with a SOF.[3]

46.     The Initial Term of the MMSA was 36 months, with 12-month automatic renewals unless terminated by either party. Additionally, as SOFs were issued at various points throughout the parties' relationship, the MMSA provides that the terms and conditions of the MMSA control unless and until the expiration or termination of the particular SOF, meaning that even if the parties agreed not to renew the MMSA, it would remain in full force and effect until the last of the SOFs expired or terminated. (*See* Section 3(a) of Exhibit A.)

---

[3] For example, six separate Billing Change Requests were issued for one SOF, SOF #062014-007, the substance of which SOF is discussed in more detail in fn. 4, *infra*.

47.     The MMSA permits either party to terminate the MMSA upon material breach by the other party, provided that notice of material breach is provided and the allegedly breaching party is permitted 30 days to cure such breach.

48.     Section 3(b)(i) states,

> Either party hereto may immediately terminate this Agreement, with written notice, prior to the end of the Term upon the breach of any material provision of this Agreement by the other party, which breach shall have remained uncured for thirty (30) consecutive calendar days after written notice of such failure *shall* have been given to such party. (emphasis added).

(Section 3(b)(i) of Exhibit A.)

49.     Section 3(b)(iii) also permits Gridforce to "immediately" terminate the agreement with 30 days prior written notice in the event that Gridforce "identif[ies] any governmental rule or regulation applicable to [Gridforce] or its customers that would be violated by this agreement or the [SOFs] and which cannot be prevented or mitigated by Contour." (*See* Section 3(b)(iii) of Exhibit A.)

50.     "Confidential Information" is defined in Section 7(b) as, *inter alia*,

> any proprietary or confidential information whether in verbal, written or some other tangible medium, including but not limited to . . . technical data, trade secrets, know-how, assets, operations, finances, technologies . . . processes, apparatus, equipment, algorithms, formulae, software, research, experimental work, products, [and] service plans.

(Section 7(b) of Exhibit A.)

51.     Upon such expiration or termination by either party, Section 3(c) requires each party to deliver to the other party all Confidential Information owned by the other party, and "certify in writing to the other party within one week after the expiration or termination of [the

MMSA] that it [did so]."[4] (*See* Section 3(c) of <u>Exhibit A</u>.)

52.     Section 6(a) of the MMSA, entitled, "Ownership," was negotiated by Contour to protect Contour's rights to the original and valuable Confidential Information and Trade Secrets provided by Contour to Gridforce, and was specifically agreed to by Gridforce. Unambiguously, Section 6(a) states,

> Notwithstanding anything in this Agreement or any Exhibits to the contrary, Contour shall retain all exclusive right, title and interest to its software, technologies processes, systems, platforms, techniques, materials, equipment, templates, programs, know-how or other materials that are owned by or licensed to Contour including, but not limited to, any modifications or enhancements made to the foregoing while providing the Services hereunder, except for [that owned by Gridforce] as described in subsection (b) below[,] *i.e.*, Contour's Confidential Information and Trade Secrets. (*See* Section 6(a) of <u>Exhibit A</u>.)

53.     While Section 6(a) gives Contour ownership of its Confidential Information and Trade Secrets, Section 6(b) gives Gridforce ownership of the Gridforce data therein, i.e., employee-specific data, information related to Gridforce's business, etc. (*See* Section 6(b) of <u>Exhibit A</u>.)

54.     Though the MMSA was signed on June 27, 2014, the parties did not settle on final financial terms until July 22, 2014. (<u>Exhibit C</u>.) During the negotiations, Gridforce informed Contour that, although it did not have much capital to cover Contour's upfront costs associated with building the Gridforce IT system – including equipment, license, and simple manpower costs – it was able to pay a significant ongoing monthly fee for Contour's design, construction, maintenance, support, and management of the Gridforce IT system and for Gridforce's use of the same during the term of the MMSA.

55.     As such, Contour agreed to an upfront fee of $128,775, as well as a payment of

---

[4] Contour's "Confidential Information" defined in Section 7(b) and protected in section 6(a) is the same as the Confidential Information and Trade Secrets identified in ¶ 33, *supra*.

$79,804.27 per month for five years, <u>in addition to</u> the provisions set forth in Section 6(a) providing ownership to Contour of everything Contour created. (*See* <u>Exhibit C</u>.) Contour regarded its retention of its Confidential Information and Trade Secrets (Section 6(a)) as the most critical provision of the MMSA.

56.     Over the course of the first year of the agreement, the parties agreed to an increased monthly fee payable to Contour of $100,999.38 and created a new 60-month term. The parties' assent to the MMSA's new monthly fee and new 60-month term were memorialized in SOF #062014-007 ("SOF007"), signed on August 11, 2015; instead of expiring in June 2019, the MMSA would now not expire until August 11, 2020. (*See* <u>Exhibit D</u>.)

57.     It is no exaggeration to describe what Gridforce provided to Contour at the inception of the parties' relationship as a completely blank slate and mere list of system requirements – no equipment, processes, techniques, licenses, or technology was given. Rather, each and every block of the Gridforce IT system was designed, created, authored, and built solely and originally by Contour, all of which, per Section 6(a) of the MMSA, would and does belong to Contour as Contour's Confidential Information and Trade Secrets, and which could only be used by Gridforce during the term of the MMSA and if Gridforce paid the fees/invoices required by the MMSA for such use.

58.     The MMSA is governed by the laws of Maryland. (*See* Section 12(i) of <u>Exhibit A</u>.)

## **2016 CORRESPONDENCE**

59.     The first few years of the parties' relationship were largely successful, and Gridforce repeatedly praised Contour for the system Contour created and the services (and the use of the IT system) it continued to provide.

60.     On September 22, 2016, however, then-Managing Director (now President) of Gridforce, C.J. Ingersoll, Esq., sent a letter to Rocco Guerriero, President and CEO of Contour, identifying what Gridforce claimed were "material breaches" of the MMSA by Contour ("2016 Breach Letter").[5]

61.     Specifically, Gridforce alleged that Contour failed to implement a compliant National Energy Regulatory Commission ("NERC") Critical Infrastructure Protection Reliability Standards ("CIP") program by the required deadline of July 1, 2016. Gridforce demanded "immediate corrective action by Contour and the implementation of a compliant NERC CIP program," and reserved its right to terminate the MMSA, citing Section 3(b)(iii) (*see supra* ¶ 43) as authority for such purported right to terminate.[6]

62.     Contour responded to Gridforce's September 22, 2016 letter on October 4, 2016 ("2016 Response"), responding to each and every one of Gridforce's allegations in detail, and noting its total disagreement with Gridforce's purported right to terminate, as well as each of Gridforce's allegations.[7]

63.     Among other things, Contour noted that, contrary to Gridforce's identification, Section 3(b)(iii) of the MMSA was inapplicable to any alleged breaches by Contour, as Gridforce had not identified any way in which the MMSA itself violated a governmental rule or regulation.

64.     Contour additionally reminded Gridforce that CIP compliance was not Contour's

---

[5] The 2016 Breach Letter may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

[6] Though Gridforce cited to Section 3(b)(iii) of the MMSA in both its September 22, 2016 and February 7, 2020 (discussed infra) letters to Contour, Contour disagrees that Section 3(b)(iii) is applicable to these issues: even if Gridforce had a noncompliant CIP program, NERC's regulations apply to Gridforce, not Contour; Contour was not subject to NERC's authority as an IT company, and could only perform the actions requested of it by Gridforce. Therefore, if Gridforce's program was noncompliant, it was the result of Gridforce's failures to provide proper instruction and guidance to Contour as to what was needed.

[7] The 2016 Response may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

responsibility, but rather Gridforce's; Contour could only perform the tasks requested of it by Gridforce. Therefore, if Gridforce did not have a compliant CIP program, such noncompliance was the result of Gridforce's failure to inform Contour of the CIP requirements and collaborate concerning the same.

65.     Following Contour's 2016 Response, Gridforce did not raise any issues related to CIP compliance until February 2020, and Contour thus considered the issues raised in the September 2016 Letter closed, satisfied, and/or cured.

66.     NAES purchased Gridforce in July 2017.

## THE "LIFT AND SHIFT" OF THE CONTOUR-CREATED IT SYSTEM

67.     In/around the spring of 2019, Gridforce and NAES determined – unbeknownst to Contour – that Gridforce no longer wished to honor its commitments under the MMSA, and instead, Gridforce and NAES would undertake the theft of the Contour-created IT System and misappropriation of Contour's Confidential Information and Trade Secrets.

68.     In connection therewith, NAES hired Kristin Nelson as a Senior Project Manager to oversee what Gridforce and NAES then described as a large "data migration" project. In reality, Gridforce and NAES were planning to steal the Contour-created IT System, and "lift and shift" it from servers owned and operated by Contour to those owned and controlled by Gridforce. Gridforce and NAES intentionally concealed this scheme from Contour.

69.     Despite being labeled as a "Gridforce employee," Ms. Nelson was contacted by a NAES recruiter when she applied for her position, her salary was paid by NAES, and her employment offer and letter came from NAES.

70.     Ms. Nelson was hired by NAES to perform the "lift and shift," i.e., theft, of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

71.     Ms. Nelson and other individuals, including Gridforce employee Keith Kerr and NAES employee Edward Angus, working on the "lift and shift" were ordered to keep the "project," i.e., theft, secret from Contour, as Contour would "shut the project down" if it was made aware.

72.     After Ms. Nelson's hire, and upon realization that the work involved in the "lift and shift" was extensive, NAES retained the services of CDW[8] to assist in the project.

73.     CDW was hired by NAES to perform the "lift and shift," i.e., theft, of the Contour-created IT System and Contour's Confidential Information and Trade Secrets. CDW employee Michael Peters – also known as CDW's "Chief Migrator" – was intimately involved in the migration of the Contour-created IT System and Contour's Confidential Information and Trade Secrets. Mr. Peters, from CDW's offices in Texas, used his computer to access Contour's protected computer systems based in Utah and Pennsylvania at the direction of Gridforce and NAES. Mr. Peters was provided a username and password by Gridforce and NAES to access Contour's protected computer systems and servers. Upon gaining unauthorized access, Mr. Peters proceeded to "lift and shift" the Contour-created IT System and Contour's Confidential Information and Trade Secrets without Contour's knowledge or consent.

74.     Upon information and belief, NAES paid each invoice CDW submitted to Gridforce and/or NAES in connection with CDW's work on the "lift and shift."

75.     Upon information and belief, CDW has worked extensively for NAES in the past.

76.     CDW was also told by Gridforce and/or NAES not to disclose any details of the "lift and shift" to Contour.  Despite having knowledge that Contour owned the computer systems and servers CDW breached, CDW made no effort to get Contour's authorization before proceeding with the "lift and shift."

---

[8] Upon information and belief, CDW Corporation was the entity hired by NAES to perform the "lift and shift," but change orders and statements of work were issued to NAES by CDW Direct, LLC. "CDW" is used herein to refer to both entities.

77.   Despite CDW's obvious sophistication as a technology company, and the fact that concealing the "lift and shift" from the creator and owner of the system – Contour – was well outside the norm of data migration procedure, CDW acquiesced and proceeded in line with Gridforce and/or NAES's request.

78.   CDW was given full access, including a username and password, by Gridforce and/or NAES to the Contour-created IT System and Contour's Confidential Information and Trade Secrets during the course of CDW's work in connection with the "lift and shift;" at (at least) one point during the project, CDW had the entirety of the Contour-created IT System in its possession and on its servers.   Upon information and belief, CDW still maintains a copy of the entirety of the Contour-created IT System in its possession.

79.   Upon accessing the Contour-created IT System, the user was met with a disclaimer identifying the System as the property of Contour and prohibiting all unauthorized use.

80.   Gridforce, NAES, and CDW would have seen this disclaimer each time they accessed the system.   Despite having knowledge of the disclaimer, CDW disregarded it and proceeded with the unauthorized "lift and shift."   CDW never contacted Contour to get its consent prior to commencing the unauthorized "lift and shift."

81.   Ms. Nelson and others at Gridforce and/or NAES were aware that the Contour-created IT System belonged to and was owned by Contour.

82.   Ms. Nelson raised several concerns to her superiors at Gridforce concerning the ethics and legality of the "lift and shift," including C.J. Ingersoll and Denise Ayers, but Ms. Nelson was rebuffed and ordered to simply do her job.

83.   In/around November 2019, Contour became suspicious of Gridforce's actions, and as a result, Gridforce and/or NAES and CDW were forced to "maneuver around" Contour's

roadblocks. CDW thus knowingly and actively participated in the concealment of the theft of the Contour-created IT System.

84.     At the conclusion of CDW's involvement in the "lift and shift" in/around the fall of 2019, Ms. Nelson was ordered by C.J. Ingersoll to require CDW to "destroy ALL evidence" of the project that CDW had in its possession.[9]

## MMSA 2019 AUTO-RENEWAL

85.     Following Gridforce's baseless accusations concerning alleged noncompliance by Contour – accusations which Gridforce never pursued or raised again until February 2020 – Gridforce and Contour continued their working relationship, and Gridforce requested the issuance of at least 11 additional SOFs throughout the following years, representing new work performed by Contour for Gridforce.[10]

86.     Additionally, in September 2019, Gridforce agreed to an automatic 36-month extension of the MMSA by requesting multiple Billing Change Requests related to SOF #007. (Exhibit E; see also Exhibit D.) This auto-renewal was the result of the issuance of additional licenses and work performed by Contour at Gridforce's request relating to Gridforce's data center.[11]

87.     Because these types of modifications to the Gridforce licenses and data center – which were demanded by Gridforce – necessarily required Contour to enter into extended

---

[9] Contour issued a subpoena to CDW on September 15, 2020. Dkt. No. 34. CDW produced only a handful of documents in response to the subpoena before Gridforce filed its Motion for Protective Order Regarding CDW Discovery (Dkt. No. 54), threatened CDW with a breach of contract action if CDW further complied with the subpoena, and halted all production of documents and witnesses by CDW.

[10] The SOFs may contain confidential of Gridforce and/or a third party, and as such, will not be attached as exhibits to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

[11] As described in ¶ 63, infra, the auto-renewal was not based on how much additional cost was added to Gridforce's monthly bill, but on the impact of the Gridforce's requested changes, in that the additional requested licenses and data center changes triggered other obligations and requirements on Contour's part.

agreements with its own vendors and suppliers in order to perform the requested work (meaning changes were made to Gridforce's monthly billing), the MMSA and language in the applicable SOF provided for the automatic extension. Essentially, had the SOF not provided for an automatic extension of the MMSA to match the new obligations Contour was required to undertake, Contour would have entered into agreements and licenses with its own vendors and suppliers in order to satisfy Gridforce's requests, and would have been both contractually and financially obligated to honor those agreements and licenses after the original term of the MMSA expired.

88.     In addition to Gridforce representatives, specifically but not limited to Denise Ayers, Vice President of Finance, explicitly informing Contour that Gridforce agreed to the renewal of the MMSA, Gridforce also agreed to a suggested large-scale server implementation project in October 2019.[12] These overt actions in September and October 2019 evidence that, contrary to Gridforce's current assertions, the parties' working relationship was in no way troubled and that Gridforce had not expressed any dissatisfaction with Contour's work product after September 2016.

## GRIDFORCE'S NON-RENEWAL AND TERMINATION LETTERS

89.     On December 23, 2019, Ms. Ingersoll wrote to Mr. Guerriero, and informed him that, under Section 3(a) of the MMSA, Gridforce did not intend to renew the MMSA and that the MMSA would consequently terminate on June 27, 2020 (the "Notice of Non-Renewal").[13]

90.     The purpose of Ms. Ingersoll's letter was not to terminate the MMSA, but rather, in Gridforce's mind, to decline its renewal/extension; the MMSA remained in full force and effect.

---

[12] To place the size of the server project into perspective, in preparation for the project's implementation, Contour allocated over $250,000 worth of equipment necessary to upgrade the servers. This work also stemmed from SOF #007, but Contour was not able to issue a Billing Change Request for the project prior to the inception of the parties' current dispute.

[13] The Notice of Non-Renewal may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

91.     As Ms. Ingersoll and Gridforce well knew, however, the MMSA was not due to expire on June 27, 2020, but rather on August 11, 2023, according to SOF #007 and the extension agreed to by Gridforce in 2015 (*see supra* ¶ 50), as well as the renewal agreed to by Gridforce in September 2019 (*see supra* ¶¶ 62-63).

92.     During January 2020, the parties engaged in various discussions concerning Gridforce's return of equipment related to the server upgrade; Gridforce had retained both the old and new server equipment, and was stonewalling Contour's attempts to retrieve whatever equipment Gridforce would no longer require.

93.     During these discussions, Contour also reminded Gridforce that the MMSA was in renewal until August 2023 based on the terms of the agreement and Gridforce's acquiescence to both those terms and the renewal itself, and therefore would not expire until that time.

94.     Though Gridforce had the right as a customer not to renew the MMSA, it remained under a legal obligation to pay its outstanding invoices (plus interest at a rate of 1.5% per month), as well as the monthly fees due for the remainder of the term of the MMSA.

95.     Accordingly, immediately following receipt of the Notice of Non-Renewal, Mr. Guerriero and Gridforce's representative, Alan Bull (General Manager for Energy Compliance at NAES) began to discuss the wind-down of the parties' relationship, the return of and assurance that Gridforce would cease using Contour's Confidential Information and Trade Secrets, and the payment of outstanding invoices due from Gridforce to Contour (plus interest), then-totaling $406,676.26.

96.     Mr. Guerriero provided Mr. Bull with extensive information concerning these issues during email exchanges and conversations in January 2020.[14]

---

[14] Mr. Guerriero engaged outside counsel in late January 2020, who began discussions with NAES representatives at that time on Contour's behalf. NAES also involved its Associate General Counsel, David Miner,

97.     On February 7, 2020, Gridforce provided Contour with a Notice of Termination for Default ("Termination Letter").[15]

98.     The Termination Letter referred back to Gridforce's 2016 Breach Letter – which Gridforce had not raised at <u>any time</u> in the ensuing 3.5 years – and alleged that Contour had committed material breaches of the MMSA by, in essence, failing to maintain an adequate IT network.

99.     Citing Section 3(b)(iii) of the MMSA, Gridforce also alleged that it was subject to an enforcement action by the NERC as a result of a noncompliant CIP program and Contour's breaches, and that the alleged enforcement action was a "separate ground for termination" of the MMSA.[16]

100.    Gridforce stated in its Termination Letter that it was therefore exercising its right to <u>immediately</u> terminate the MMSA.

101.    Assuming that the allegations against Contour in Gridforce's Termination Letter are true – which they are not – the statements therein mean that Contour had purportedly been in material breach of the MMSA for 3.5 years. However, Gridforce never sought to terminate the MMSA in those 3.5 years, and even as recently as less than 45 days before the Termination Letter, had only issued a Notice of Non-Renewal; if Contour's actions were so egregious, it is unclear why Gridforce did not terminate the MMSA sooner.

102.    Regardless, these statements concerning CIP noncompliance and the purported NERC enforcement action – and Gridforce's attempts to refer back to its September 2016 Breach

---

in the discussions around this time.

[15] The Termination Letter may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

[16] Again, since September 2016, Gridforce had not raised any issues related to CIP compliance with Contour, and did not provide any further details in its Termination Letter concerning any purported "enforcement action."

Letter – do not provide any valid basis for terminating the MMSA. Not only do NERC's standards not apply to <u>Contour</u> (as discussed in fn. 6, *supra*), Gridforce was silent concerning any purported noncompliance by Contour for over three years, demonstrating that either (1) Gridforce wholly accepted Contour's 2016 Response and total denial that Contour ever breached the MMSA and/or (2) Contour fully cured the issues Gridforce raised in its 2016 Breach Letter.[17]

103.    As explained to Mr. Bull by Mr. Guerriero in January 2020 and later by Contour's outside counsel, it was – and actually is – Contour, not Gridforce, that has incurred significant damages and harm as a result of <u>Gridforce's</u> material breaches of the MMSA, including but not limited to Gridforce's failure to pay invoices currently and past due, the continued unauthorized use and unlawful retention and disclosure of Contour's Confidential Information and Trade Secrets, and loss of future amounts owed to Contour under the renewal provisions of the MMSA.

104.    Moreover, Contour learned in/around October 2020 that during the execution of the "lift and shift," i.e., theft, of the Contour-created IT System, Gridforce and/or NAES and CDW destroyed approximately 15% of that System and Contour's Confidential Information and Trade Secrets.

105.    Mr. Bull repeatedly acknowledged that Gridforce was in arrears to Contour and that Contour is entitled to not only payment for the outstanding invoices (plus interest), but also lost profits, expenses incurred by Contour (including license fees, etc.), and costs of collection. However, NAES has refused to fully compensate Contour.[18]

106.    NAES has also refused to provide requested information confirming that

---

[17] Contour reasserts its denial that it ever breached the MMSA, either in 2016 or at any point during the parties' relationship.

[18] Apart from Ms. Ingersoll's Termination Letter, all communications pertaining to the Contour-Gridforce relationship beginning in January 2020 were between Contour and NAES; Gridforce did not participate in these discussions. Though Contour had always suspected that, for all intents and purposes, NAES controlled Gridforce, it was clear to Contour during the February – June 2020 discussions between Contour and NAES that NAES – not Gridforce – possessed the authority to resolve the dispute between Contour and Gridforce.

Gridforce has ceased using – and has not used since February 7, 2020 – Contour's Confidential Information and Trade Secrets and/or that Gridforce has not disclosed Contour's Confidential Information and Trade Secrets to any third party.[19]

107.   For example, Contour has repeatedly requested that Gridforce provide the log files for the Gridforce system, which are essentially a constant journaling of any changes made to the system; a review of the log files would confirm whether Gridforce misappropriated and altered Contour's Confidential Information and Trade Secrets for use in its new system, disclosed the same to third parties, and/or continues to use Contour's Confidential Information and Trade Secrets in its new system.

108.   To be clear, the log files Contour requested would definitively show if Gridforce is complying with its obligations under the MMSA and state and federal trade secrets law, but Gridforce has refused to provide them to Contour.

109.   Similarly, Contour also requested that NAES compare the IT system Contour created for Gridforce with the new Gridforce IT system purportedly created wholly by CDW.[20] Contour suggested that NAES either: (1) provide Contour with the new system for comparison; (2) provide a reputable and independent third party with the new system for comparison; or (3) that NAES conduct the comparison itself and provide the results to Contour. NAES has refused these requests.[21]

110.   In compliance with its own obligations under the MMSA, Contour has repeatedly

---

[19] To the contrary, Gridforce acknowledged that it did, in fact, disclose Contour's Confidential Information and Trade Secrets to CDW, Gridforce's new IT vendor.

[20] An analysis of the two systems would reveal whether any of Contour's Confidential Information and Trade Secrets were used in the design and creation of the new system, or whether the Confidential Information and Trade Secrets are still being used in the operation of the new system.

[21] Though NAES initially agreed to retain the log files and provide them to Contour, NAES then reversed course and inexplicably refused to do so. NAES's concealment of the log files and refusal to conduct a system comparison have prevented Contour from obtaining evidence crucial to its claims (and which could exonerate NAES on Contour's trade secret claims) and has therefore only lent further credence to Contour's allegations.

requested that NAES provide a device to Contour so that Contour may securely return Gridforce's data – and Contour remains ready, willing, and able to do the same – but NAES appears oddly uninterested in the return of Gridforce's data, and has essentially ignored Contour's repeated requests to provide a device.

111.   During these discussions with NAES and pursuant to Section 12(b) of the MMSA, Contour also suggested that the parties attend mediation in an effort to resolve the parties' breach of contract dispute. While NAES agreed to do so in principle, they then failed to respond to Contour's proposals concerning a mediator or further cooperate concerning the mediation process, and thus, mediation between the parties appears futile.

112.   Four months after the Termination Letter, in June 2020, NAES informed Contour that Gridforce had been purportedly fined $4.8 million by the NERC as a result of Contour's alleged failures to maintain a compliant CIP program.

113.   This was the first time Gridforce ever informed Contour that NERC had levied fines against Gridforce related to CIP compliance, despite constant email exchanges and telephone discussions in the first six months of 2020 concerning monies owed to Contour and the return of Contour's Confidential Information and Trade Secrets. Contour remains unaware of when these purported fines were levied or their basis, but denies that it is in any way responsible for any fines levied against Gridforce by the NERC and/or that it failed to meet any CIP program specifications it was provided by Gridforce.

114.   The sum total of outstanding invoices due and payable to Contour by Gridforce through February 7, 2020 (the date of the Termination Letter) for services rendered, less payments made, plus continuing interest at a rate of 1.5% per month, is $8.384.04[22] (Exhibit F.)

---

[22] The $8,384.04 total identified here includes only those invoices for services rendered through the date of Gridforce's termination, less payments made by Gridforce subsequent to Contour's filing of the Verified Complaint.

## COUNT I
## <u>BREACH OF THE MMSA</u>
## <u>(GRIDFORCE)</u>

115.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

116.    Contour and Gridforce entered into the MMSA on June 27, 2014.

117.    Pursuant to Section 6(a) of the MMSA, Gridforce agreed that all Contour Confidential Information and Trade Secrets used to develop Gridforce's IT system was and would remain Contour property through the pendency of the MMSA and after its expiration or termination.

118.    Gridforce also agreed, pursuant to Section 6(c) of the MMSA, that it would not "delete, alter, cover, or distort any copyright, trademark, or other proprietary rights notice placed by [Contour] on or in Contour materials and information or Technology and shall ensure that all such notices are reproduced on all copies thereof."

119.    Gridforce also agreed: (1) pursuant to Sections 2 and 3(d), to pay Contour for services rendered; (2) pursuant to Section 3(c), to return and cease using all Contour Confidential Information and Trade Secrets to Contour at the expiration or termination of the MMSA; and (3) pursuant to Section 7(a), to not disclose Contour's Confidential Information and Trade Secrets to any third party and/or use Contour's Confidential Information and Trade Secrets for its own benefit or for the benefit of a third party, except as allowed for under the MMSA.

120.    Despite these clear contractual obligations, Gridforce (1) improperly attempted to terminate the MMSA, (2) disclosed Contour's Confidential Information and Trade Secrets to one or more third parties, including but not limited to its new IT vendor, CDW, (3) has failed to pay

---

Because the MMSA was not due to expire as of the date of Gridforce's improper termination (as set forth, *supra*), this figure does not include amounts for which Contour has continued to invoice Gridforce, and interest owing on those amounts.

invoices due and owing to Contour totaling hundreds of thousands of dollars, plus interest, (4) used Contour's Confidential Information and Trade Secrets in its new IT system and continues to use the Confidential Information and Trade Secrets of Contour today, (5) removed and/or deleted the disclaimer Contour placed on the Contour-created IT System identifying the System as Contour property and prohibiting unauthorized access, and (5) has failed to return Contour's Confidential Information and Trade Secrets, all in material breach of the MMSA and certain common law and statutory obligations as set forth herein below.

121.    Gridforce's actions are a breach of, at least, Sections 2, 3(c) and (d), 6(a), 6(c), and 7(a) of the MMSA.

122.    As a result of Gridforce's breaches of the MMSA, Contour has suffered and continues to suffer damages.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF**
**Md. Code Ann. § 11-1201 *et seq*. and/or including but not limited to**
**12 Pa. C.S.A. § 5301 *et seq*., Tex. Civ. Prac. and Rem. Code § 134A *et seq*.,**
**Wash. Rev. Code § 19.108 *et seq*., and Del. C. § 2001 *et seq*.**
**(GRIDFORCE, NAES, CDW, DOE DEFENDANTS, AND ABC DEFENDANTS)**

123.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

124.    The techniques, strategies, and processes used to design and implement the IT system Contour created for Gridforce are proprietary to Contour and constitute legally protectable trade secrets as defined by the Maryland Uniform Trade Secrets Acts, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Gridforce has used or disclosed Contour's Confidential Information and Trade Secrets.

125.    The Confidential Information and Trade Secrets have actual or potential economic value because, both separately and in combination, that information is not generally known to, and is not readily ascertainably by proper means by others, including Contour's competitors.

126.    Contour spent substantial sums of money and expended significant time and energy to develop and generate the Confidential Information and Trade Secrets and has taken steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

127.    Contour was at all times in lawful possession of the Confidential Information and Trade Secrets, and used them exclusively in its lawful business activities.

128.    Contour shared its Confidential Information and Trade Secrets with Gridforce pursuant to the MMSA and therefore in the course of its confidential relationship with Gridforce.

129.    Upon information and belief, Gridforce took Contour's Confidential Information and Trade Secrets and currently uses it in its current IT system, without Contour's permission or authorization.

130.    Upon information and belief, NAES, without Contour's permission or authorization, accessed the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

131.    Upon information and belief, CDW, without Contour's permission or authorization, accessed the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

132.    Upon information and belief, NAES and CDW assisted Gridforce in its theft of Contour's Confidential Information and Trade Secrets.

133.    Upon information and belief, Gridforce disclosed Contour's Confidential

Information and Trade Secrets to NAES, CDW, Doe Defendants, ABC Defendants, and other third parties.

134.    As described in the foregoing paragraphs, Gridforce, knowing that it had access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Gridforce has used or disclosed Contour's Confidential Information and Trade Secrets.

135.    As described in the foregoing paragraphs, NAES, knowing that it had unauthorized access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which NAES has accessed, used, or disclosed Contour's Confidential Information and Trade Secrets.

136.    As described in the foregoing paragraphs, CDW, knowing that it had unauthorized access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade

Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which CDW has accessed, used, or disclosed Contour's Confidential Information and Trade Secrets.

137.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by Gridforce constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

138.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by NAES constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

139.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by CDW constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

140.    Gridforce's misappropriation of Contour's Confidential Information and Trade

Secrets was undertaken willfully and maliciously.

141.   NAES's misappropriation of Contour's Confidential Information and Trade Secrets was undertaken willfully and maliciously.

142.   CDW's misappropriation of Contour's Confidential Information and Trade Secrets was undertaken willfully and maliciously.

143.   Upon information and belief, NAES knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, NAES's misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which NAES has misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

144.   Upon information and belief, CDW knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Doe Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

145.   Upon information and belief, Doe Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and

Trade Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Doe Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

146.    Upon information and belief, ABC Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which ABC Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

147.    By virtue of the foregoing, Contour has suffered and will continue to suffer the loss of confidential business and proprietary information and trade secrets.

148.    As a direct and proximate result of Defendants' misappropriation of Contour's Confidential Information and Trade Secrets, Contour has suffered and continues to suffer monetary damages and irreparable harm.

**COUNT III**
**FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**
**(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)**

149.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

150.    Contour has offered for sale or sold its Confidential Information and Trade

Secrets in interstate commerce.

151.    Contour's Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known or readily ascertainable through appropriate means by other persons who might obtain economic value from their disclosure or use.

152.    Contour has made reasonable efforts under the circumstances to maintain the secrecy of its Confidential Information and Trade Secrets.

153.    Upon information and belief, Gridforce has misappropriated Contour's Confidential Information and Trade Secrets by retaining them without Contour's permission or authorization and disclosing them to third parties, including but not limited to NAES, Doe Defendants, and ABC Defendants, to Contour's detriment. Gridforce knew it did not have permission to disclose or otherwise use Contour's Confidential Information or Trade Secrets other than in Contour's interests. Gridforce's retention and disclosure were improper because, among other things, it was contractually required to cease using and return all Confidential Information and Trade Secrets to Contour upon termination or expiration of the MMSA.

154.    Upon information and belief, NAES knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, NAES's use of the Confidential Information and Trade Secrets was an improper misappropriation.

155.    Upon information and belief, CDW knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, CDW's use of the Confidential Information and Trade Secrets was an improper misappropriation.

156.     Upon information and belief, Doe Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their use of the Confidential Information and Trade Secrets was an improper misappropriation.

157.     Upon information and belief, ABC Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their use of the Confidential Information and Trade Secrets was an improper misappropriation.

158.     Defendants' retention, use, and disclosure of Contour's Confidential Information and Trade Secrets has and will irreparably harm Contour, some of which harm cannot be adequately compensated by remedies at law. The public interest would not be disserved by an injunction.

159.     To the extent Contour's harms may be compensated by legal remedies, Contour is entitled to recover damages from Defendants in an amount to be determined at law.

**COUNT IV**
**CONVERSION AND/OR NEGLIGENT DESTRUCTION OF PROPERTY**
**UNDER PENNSYLVANIA COMMON LAW**
**(GRIDFORCE, NAES, CDW)**

160.     Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

161.     The Confidential Information and Trade Secrets have actual or potential economic value because, both separately and in combination, that information is not generally known to, and is not readily ascertainably by proper means by others, including Contour's competitors.

162.     Contour spent substantial sums of money and expended significant time and energy to develop and generate the Confidential Information and Trade Secrets and has taken

steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

163.    Contour was at all times in lawful possession and the lawful owner of its Confidential Information and Trade Secrets, and used them exclusively in its lawful business activities.

164.    During the course of the theft of the Contour-created IT System and Contour's Confidential Information and Trade Secrets, Gridforce, NAES, and/or CDW destroyed approximately 15% of the same.

165.    Contour has been unable to recover approximately 15% of the Contour-created IT System and its Confidential Information and Trade Secrets.

166.    At no time did Contour consent to Gridforce, NAES, and/or CDW's theft and misappropriation of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

167.    Gridforce, NAES, and CDW had no lawful justification for the taking and destruction of 15% of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

168.    By virtue of the foregoing, Contour has suffered and will continue to suffer the loss of its Confidential Information and Trade Secrets.

169.    As a direct and proximate result of Gridforce, NAES, and CDW's conversion and/or negligent destruction of the Contour-created IT System and Contour's Confidential Information and Trade Secrets, Contour has suffered and continues to suffer monetary damages and irreparable harm.

<u>COUNT V</u>
<u>FEDERAL COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq*.</u>
<u>(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)</u>

170.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

171.    At all times relevant, Contour's computer systems and servers were connected to the internet and routinely used in interstate commerce. Contour also maintained its Confidential Information and Trade Secrets on its computer systems and servers. As such, Contour's computer system and servers constitute "protected computers" under <u>18 U.S.C. § 1030(e)(2)</u>.

172.    Contour's Confidential Information and Trade Secrets were maintained in Contour's computer system and servers. Contour maintained and secured their computer systems and servers by reasonable means.

173.    Defendants agreed to access Contour's computer systems and servers without Contour's knowledge or authorization, causing loss.

174.    On information and belief, by their conduct, Defendants extracted the Contour-created IT System and Confidential Information and Trade Secrets and caused loss to Contour in violation of <u>18 U.S.C. § 1030(a)(2)(C)</u> and <u>1030(a)(5)(C)</u>.

175.    Defendants knowingly, willfully, and with intent, accessed Contour's computers and servers without Contour's authorization and obtained valuable information, that, on information and belief, Defendants used to obtain something of value in violation of <u>18 U.S.C. § 1030(a)(4)</u>.

176.    As a direct result of Defendants' conduct, Contour has incurred reasonable costs to respond to Defendants' unauthorized access of its computer systems and servers, the theft of the Contour-created IT System and Confidential Information and Trade Secrets, and to conduct a damage assessment; and Contour has incurred other consequential damages and losses in the

aggregate amount exceeding $5,000.

177.    Pursuant to 18 U.S.C. § 1030(g), Contour is entitled to recover from Defendants the damages Contour has suffered, as well as gains, profits, advantages, and unjust enrichment the Defendants have obtained as a result of their wrongful acts alleged herein. Contour is presently unable to ascertain the full extent of these damages, gains, profits, advantages, and unjust enrichment.

178.    Furthermore, Contour has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate for injuries inflicted by the Defendants.  Accordingly, Contour is entitled to injunctive relief.

**COUNT VI**
**FEDERAL STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701, *et seq.***
**(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)**

179.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

180.    The Stored Communications Act ("SCA") provides that any "aggrieved" party may bring a civil action against a defendant who "intentionally accesses without authorization" or "intentionally exceeds an authorizations to access" a "facility through which an electronic communication service is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a)(1)-(2); *see* § 2707(a) (providing private right of action).

181.    The SCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

182.    The SCA defines an "electronic communications service" as "any service which

provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

183.   The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof;" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

184.   Contour provides authorized clients, among other things, the ability to transmit and receive "electronic communications" as defined by the SCA.

185.   Defendants intentionally accessed without authorization or intentionally exceeded authorization to access facilities through which an electronic communications services was provided and thereby obtained unauthorized access to Contour's stored electronic communications while in electronic storage – *i.e.*, when Defendants accessed Contour's computer systems and servers without Contour's authorization to "lift and shift" the Contour-created IT System and Confidential Information and Trade Secrets.

186.   By their illegal actions and conduct as alleged, Defendants caused damage to Contour, including but not limited to, theft of the Contour-created IT System and its Confidential Information and Trade Secrets.

187.   Contour was harmed by Defendants' violations, and pursuant to 18 U.S.C. § 2707(c), are entitled to actual damages, including profits earned by Defendants attributable to the violations or statutory minimum damages of $1,000 per person punitive damages, costs, and reasonable attorneys' fees.

**COUNTY VII**
**Texas Harmful Access by a Computer Act, Tex. Civ. Prac. & Rem. Code § 143.001 *et seq.***
**(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)**

188.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

189.    Texas Civil Practice and Remedies Code section 143.001 provides a civil action to "[a] person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . if the conduct constituting the violation was committed knowingly or intentionally."

190.    Texas Penal Code Section 33.02(a) makes it illegal to knowingly access another's "computer, computer network, or computer system without the consent of the owner."

191.    Contour's computer systems and servers constitute a "computer," "computer network," and/or a "computer system" under Texas Penal Code section 33.01(4)-(5), (8).

192.    Defendants violated § 33.02(a) of the Texas Penal Code by knowingly accessing Contour's computer, computer network, or computer system without Contour's consent.

193.    Defendants knowingly accessed Contour's protected computers, computer networks, and computer systems without effective consent. This knowing access without effective consent includes, CDW – at the direction of Gridforce and NAES – knowingly accessing, from its offices in Texas, Contour's computer systems and servers, based in Utah and Pennsylvania, without Contour's consent. Upon gaining unauthorized access, CDW – at the direction of Gridforce and NAES – "lifted and shifted" Contour's Confidential Information and Trade Secrets also without consent.

194.    As a direct result of this conduct, Contour suffered loss in expending time, money, and resources aggregating at least $5,000 in value, to investigate the intrusion, assess the damage, as well as the value of the Contour-created IT System and its Confidential Information

and Trade Secrets.

195.     Pursuant to <u>Texas Civil Practice & Remedies Code § 143.001(b)</u>, Contour is entitled to recover from Defendants the damages Contour has suffered as result of their wrongful acts alleged herein.

## **PRAYER**

WHEREFORE, Contour prays that this Court enter judgment in its favor on the claims set forth above and award Contour injunctive relief, compensatory damages, restitution, punitive damages, attorneys' fees, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Contour requests that this Court enter judgment in its favor and against Gridforce, NAES, CDW, Doe Defendants, and ABC Defendants as follows:

a.     Preliminarily and permanently enjoining Gridforce, NAES, CDW, Doe Defendants, and ABC Defendants from misappropriating, using, and/or disclosing Contour's Confidential Information and Trade Secrets;

b.     Ordering Gridforce, NAES, and/or CDW to return to Contour any and all information, documents, software, materials, work product, or equipment provided to it by Contour or taken by it from Contour, or relating to Contour, whether in printed or electronic form or otherwise;

c.     An accounting and disgorgement of all profits earned by Gridforce while using Contour's Confidential Information and Trade Secrets;

d.     Amounts due and owing on unpaid invoices for services rendered, plus interest through February 7, 2020 totaling $8,384.04;

e.     The costs of collection related to such unpaid invoices, totaling

approximately $91,466.38 to date;

        f.     Monthly payments for the remaining life of the MMSA through August 2023, totaling $3,975,557.82;

        g.     Compensatory and punitive damages in an amount to be determined at trial for the unlawful use and disclosure of Contour's Confidential Information and Trade Secrets pursuant to, without limitation, the Federal Computer Fraud and Abuse Act, the Federal Stored Communications Act, the Texas Harmful Access by a Computer Act, the Maryland Uniform Trade Secrets Act, the Pennsylvania Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, the federal Defend Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used and/or disclosed;

        h.     Attorneys' fees and costs resulting from this action pursuant to, without limitation, the Federal Computer Fraud and Abuse Act, the Federal Stored Communications Act, the Texas Harmful Access by a Computer Act, the Maryland Uniform Trade Secrets Act, the Pennsylvania Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, the federal Defend Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used and/or disclosed; and

        i.     Such other relief the Court may deem just and appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a jury in accordance with Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 16, 2021

*/s/ M. Kelly Tillery*
M. Kelly Tillery, PA Attorney I.D. 30380
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4401
kelly.tillery@troutman.com
*Attorney for Plaintiff, Contour Data Solutions, LLC*

<u>**VERIFICATION**</u>

I, Rocco Guerriero, on behalf of Plaintiff Contour Data Solutions LLC hereby certify and say:

1. I am an authorized representative of Plaintiff.

2. I have read the Second Amended Verified Complaint and verify that the contents are true to my personal knowledge, information, and belief, and that the statements therein are true and correct.

3. I declare under penalty of perjury under the laws of the Commonwealth of Pennsylvania that the foregoing is true and correct.

Date: September 16, 2021.

Rocco Guerriero
President and CEO
Contour Data Solutions LLC

# EXHIBIT A

# Contour Data Solutions, LLC
# Master Managed Services Agreement

**Contract ID:  # 06.25.14 Gridforce Energy Management, LLC**

---

Gridforce Energy Management, LLC

1331 Lamar St
Suite 560

Houston, TX 77010

Pricing and/or promotional benefits in this Agreement may not be available if it is signed and delivered to Contour after 12/31/14.

By: _____
President          *James Thompson*

Acceptance Date  *6/25/2014*

CONTOUR DATA SOLUTIONS, LLC

By: _____
Rebco Guerrero          *6/27/2014*
President and CEO

---

This MASTER MANAGED SERVICES AGREEMENT (the "Agreement"), is by and between Contour Data Solutions, LLC, a Pennsylvania limited liability company ("Contour"), and Gridforce Energy Management, LLC (the "Customer"). The Agreement is binding when executed by Customer and accepted by Contour, which occurs upon Contour's verification that an unaltered Customer-signed Agreement is received by a Contour implementation center.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1. Scope of Agreement

   (a) Scope of Agreement. As a "master" form of contract, this Agreement allows the parties to contract for multiple services without having to re-negotiate the terms and conditions set forth herein.

   (b) Services. Contour shall provide Customer with the services set forth on the exhibits attached hereto (each an "Exhibit" and collectively, the "Exhibits") that are checked and initialed below by both Customer and Contour (the "Services"). The Services will be provided in accordance with, and subject to, the terms and conditions set forth herein and set forth in the respective Exhibit. This Agreement shall apply to any Exhibit and to any Services performed pursuant thereto. In the event of a conflict or ambiguity between any term of this Agreement and an Exhibit attached hereto, the terms of this Agreement shall govern, unless the terms of the Exhibit expressly provide otherwise.

2. Fees, Expenses and Taxes. Customer shall pay Contour the fees, compensation and expenses (the "Fees") for the Services as set forth in each respective Exhibit. Contour will provide Customer with a monthly invoice, in arrears, for all amounts due under each Exhibit at the rates set forth in the respective Exhibit for Services performed during the previous month. Customer shall pay each invoice within thirty (30) days of the invoice date or as otherwise described in a respective Exhibit. All payments shall be made in U.S. Dollars. Interest, at the rate of 1.5% per month, calculated from the invoice date or as otherwise described in a respective Exhibit, shall be payable on all balances outstanding after their due date. Contour reserves the right to terminate Customer's use of the Services with respect to any Exhibit to the extent the undisputed amount due on the account on such Exhibit remains unpaid ninety (90) days after invoice date or as otherwise described in a respective Exhibit; provided that Contour has provided Customer with at least sixty (60) days written notice and Contour may, at its discretion, prohibit Customer's removal of equipment, software, applications or data from Contour's facility, or any subcontracted facilities, pending payment of all undisputed amounts owed to Contour by Customer. Customer shall reimburse Contour for any out-of-pocket expenses incurred by Contour in providing the Services, so long as such expenses were approved in advance and in writing by the Customer. Customer shall be responsible for reimbursing Contour for its reasonable costs of collecting undisputed unpaid amounts due hereunder including reasonable attorney's fees and collection agency fees, and other reasonable costs of collections. Customer shall also be responsible for any sales, use, excise and/or comparable taxes assessed or imposed by any governmental authority upon the services provided, except for those taxes imposed on Contour by reason of its income.

3. Term and Termination.

**Contract ID:  # 06.25.14 Gridforce Energy Management, LLC**

CONFIDENTIAL
© 2008 - 2010 Contour Data Solutions, LLC. All Rights Reserved.

# Contour Data Solutions, LLC
# Master Managed Services Agreement

**Contract ID:  # 06.25.14 Gridforce Energy Management, LLC**

(a) Term.  The term of this Agreement shall commence on the Acceptance Date above and continue, unless terminated earlier as provided herein, for a period of thirty-six (36) [months] (the "Initial Term").  Notwithstanding the foregoing, should any Exhibit entered into during the period of this Agreement require Services to be performed beyond the expiration or termination date of this Agreement, then the terms of this Agreement shall remain in effect with respect to such Exhibit(s) until the expiration or termination of the Exhibit(s) at issue.  This Agreement shall automatically renew for successive 12 (12) [month] periods (each a "Renewal Term"), unless otherwise terminated by either party giving written notice to the other party not less than one hundred eighty (180) days prior to the expiration of the Initial Term or any Renewal Term.  The Initial Term, together with each Renewal Term, are hereinafter referred to as the "Term".

(b) Termination.

   (i)  Either party hereto may immediately terminate this Agreement, with written notice, prior to the end of the Term upon the breach of any material provision of this Agreement by the other party, which breach shall have remained uncured for thirty (30) consecutive calendar days after written notice of such failure shall have been given to such party.

   (ii)  Either party hereto may immediately terminate this Agreement prior to the end of the Term, with written notice, (A) if the other party dissolves, liquidates or winds up its operations, (B) if the other party ceases to function as a going concern or to conduct operations in the normal course of business, (C) if the other party shall become insolvent, or shall ask its creditors for a moratorium, or shall file a voluntary petition for bankruptcy or shall suffer appointment of a temporary or permanent receiver, trustee or custodian for all or a portion of its assets, (D) if the other party has a petition or action filed against it under any bankruptcy or insolvency law which petition or action has not been dismissed or set aside within sixty (60) days of its filing, (E) if the other party makes an assignment for the benefit of its creditors, or (F) if anything occurs which, under the law of any jurisdiction, is analogous to any of the acts or events specified in subsections (A) – (E) above.  Either party must provide written notice within five (5) days of circumstances that could reasonably indicate that any of the acts or events specified in subsections (A) – (E) above could occur.

   (iii)  GEM may immediately terminate this Agreement, with thirty (30) days written notice, prior to the end of the Term upon GEM identifying any governmental rule or regulation applicable to GEM or its customers that would be violated by this agreement or the Exhibits and which cannot be prevented or mitigated by Contour, or its subcontractors, in coordination with Customer.

(c) Duties Upon Expiration or Termination.  Upon expiration or termination of this Agreement pursuant to Sections 3(a) or 3(b), each party shall deliver to the other party all Confidential Information (as defined below) owned by such party, and destroy the Confidential Information contained in any computer memory or data storage apparatus.  Such party shall certify in writing to the other party within one week after the expiration or termination of this Agreement that it has delivered to such party, or destroyed, the Confidential Information and all copies of the Confidential Information.

(d) Effect of Expiration or Termination.  Upon termination of this Agreement, neither Contour nor the Customer shall have any further rights or obligations hereunder except for (i) Customer's obligation to pay Contour the Fees due and payable as of the date of expiration or termination of this Agreement, and (ii) the parties' respective obligations under Sections hereof.  The following sections survive the termination and expiry of this Agreement; Sections 2, 3, 4 and 6 through 12 hereof.

4. Independent Contractor Status.  The relationship of Contour to Customer shall be that of an independent contractor, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship.

5. Change Order Proposal.  Customer may, from time to time, submit to Contour a request for changes to an existing Exhibit.  If, in Contour's reasonable judgment, the requested changes can be implemented without requiring additional Contour time or resources and without affecting Contour's ability to maintain any respective project schedule, Contour will implement the change at no additional cost to Customer.  Otherwise, Contour shall provide Customer with a written change order proposal for the additional work, including.  (a) price change, (b) impact on project schedule, and (c) a revised Exhibit, including additional requirements of Customer, if any.  Customer may, at its discretion, accept or reject Contour's change order proposal.  Change orders shall be considered effective upon written consent of both parties.  Any Contour change order proposal will be considered rejected if ten (10) business days pass without written acceptance by Customer.  Each party shall use its best efforts to respond as expeditiously as possible to such change requests and change order proposals.  Notwithstanding anything in this Agreement to the contrary, no changes that effect project time or cost will be permitted without the prior written approval from Contour.

6. Ownership.

(a) Contour Materials and Information.  Notwithstanding anything in this Agreement or any Exhibits to the contrary, Contour shall retain all exclusive right, title and interest to its software, technologies, processes, systems, platforms, techniques, materials, equipment, templates, programs, know-how or other materials that are owned by or licensed to Contour including, but not limited to, any modifications or enhancements made to the foregoing while providing the Services hereunder, except for GEM Technology as described in subsection (b) below.

**Contract ID:  # 06.25.14 Gridforce Energy Management, LLC**

# Contour Data Solutions, LLC
## Master Managed Services Agreement

**Contract ID: # 06.25.14 Gridforce Energy Management, LLC**

(b) **GEM Technology.** GEM retains all rights, titles, and interests (including ownership of all patents, patent applications, including continuations, continuations-in-part, divisionals, reexaminations, and reissues, copyrights, trade secrets, know-how, service marks and all other intellectual property rights including any derivatives, modifications or alterations thereto that are conceived, created, or expresses by GEM ("Intellectual Property") with respect to, and Contour shall not acquire any interest or lien in or upon, any data, know-how, inventions, databases, tools, algorithms, architecture, user interface designs, objects, methodologies, formulas, processes, manuals, materials, reports, software (including object and source codes), documentation, training materials, hardware, equipment and networks or any other information or materials that are proprietary to GEM and used by GEM to provide its services or that are related to such services, including any enhancements, improvements, changes, modifications or additions thereto by or on behalf of GEM which are made and paid for by GEM including any enhancements, improvements, changes, modifications or additions made by Contour at the direction of, and paid for by, GEM under this Agreement during the Term (collectively, the "GEM Technology"). In furtherance of the foregoing, Contour hereby assigns and agrees to assign in the future to GEM any and all of its right, title, and interest in and to any GEM Technology, including any Intellectual Property therein, during the Term of this Agreement. At the reasonable written request of GEM, Contour shall promptly perform any and all other reasonable acts, at CECD's expense, that are necessary in order for CECD to perfect its interests in and to CECD Technology. CECD shall reimburse Contour within thirty (30) days of Contour's request for such reimbursement.

(c) **Notices.** Contour and Customer shall not delete, alter, cover, or distort any copyright, trademark, or other proprietary rights notice placed by the other party on or in Contour materials and information or Technology and shall ensure that all such notices are reproduced on all copies thereof.

7. **Confidentiality.**

(a) **Non-Disclosure.** Each party (the "Disclosing Party") may deliver or make available to the other party (the "Recipient") certain Confidential Information (as defined below). The Recipient agrees that neither Recipient nor Recipient's Representatives (as defined below) will, directly or indirectly, (i) use the Confidential Information in any way other than for the purpose of providing or receiving the Services hereunder, or (ii) disclose to any third party or use for Recipient's own benefit or for the benefit of any third party, all or any part of the Confidential Information, except as expressly provided for herein. The Recipient shall be entitled to disclose the Confidential Information only to those employees, officers, agents, advisers and auditors of the Recipient (collectively, the "Representatives") that have completed any required training and background checks required by the Disclosing Party, communicated in writing, necessary for the purposes above; provided that the Recipient advises each such Representative of the obligations contained herein and that by receiving such information, the Representatives are agreeing to be bound by this Agreement. The Recipient shall be responsible for any breach of this Agreement by Recipient's Representatives and shall indemnify and hold the Disclosing Party harmless from any such breach.

(b) **Definition.** The term "Confidential Information" as used in this Agreement shall mean any proprietary or confidential information, whether in verbal, written or some other tangible medium, including, but not limited to, any prospective business opportunities, technical data, trade secrets, know-how, assets, operations, finances, technologies, patents, copyrights, trademarks, techniques, drawings, sketches, models, inventions, processes, apparatus, equipment, algorithms, formulae, software, research, experimental work, products, service plans, markets and market studies, design details and specifications, engineering information, procurement requirements, customer lists, customers, pricing and cost information, business forecasts, sales, distribution, merchandising and marketing plans and information; provided, however, such term shall not include (i) information which, at the time of disclosure, is already known or available to the public, can be obtained from public sources or is otherwise in the public domain, (ii) information which, after disclosure, becomes known or available to the public through no breach by the Recipient or Recipient's Representatives of this Agreement, (iii) information already in the Recipient's possession at the time of disclosure, as evidenced by written documentary records of the Recipient, (iv) information which was independently developed by or for the Recipient without the use of or reliance on the Disclosing Party's Confidential Information, (v) information received by the Recipient from another person or entity who is not known by the Recipient to be under an obligation to the Disclosing Party to keep the same confidential, or (vi) subject to Section 7(c) below, information the Recipient is required by court order, injunction, writ, law, rule or regulation to disclose, provided the Recipient has received and delivered to the Disclosing Party an unqualified opinion of its counsel that such disclosure must be made by the Recipient in order that it not commit a violation of law.

(c) **Court Order.** In the event that the Recipient and/or its Representatives are requested or required to disclose any of the Confidential Information in an investigatory, legal, regulatory or administrative proceeding, the Recipient shall provide the Disclosing Party with prompt notice thereof, prior to making any disclosure, so that the Disclosing Party may, in its discretion, seek a protective order or other appropriate remedy. The Recipient agrees to consult and cooperate with the Disclosing Party in seeking a protective order or other appropriate remedy; provided, that the Disclosing Party shall reimburse the Recipient for its reasonable out-of-pocket expenses incurred in connection with such consultation and/or cooperation provided by Recipient pursuant to this Section 7(c).

(d) **Remedies.** Contour and Customer expressly acknowledge that the remedy at law for any breach of Section 7 will be inadequate, and that, upon any such breach or threatened breach, the Disclosing Party shall be entitled as a matter of right to injunctive relief in any court of competent jurisdiction, in equity or otherwise, and to enforce the specific performance of the Recipient's obligations under these provisions without the necessity of proving the actual damage to the Disclosing Party or the inadequacy of a legal remedy. The rights conferred upon the Disclosing Party by the preceding sentence shall not be exclusive of, but shall be in addition to, any other rights or remedies which the Disclosing Party may have at law, in equity or otherwise.

8. **Indemnification.**

(a) **Contour Indemnity.** Contour shall indemnify, defend and hold harmless the Customer and its officers, directors, shareholders, employees, agents, successors and assigns (collectively, the "Customer Indemnified Parties"), from any and all liabilities, judgments, costs, losses, damages and expenses (including reasonable attorneys' fees and court costs) (collectively, the "Losses"), in connection with any claim, suit, action or other proceeding brought or threatened by a third party against any of the Customer Indemnified Parties, and relating to, based upon or arising out of or in connection with (i) any gross negligence or willful misconduct on the part of Contour or any of Contour's

**Contract ID: # 06.25.14 Gridforce Energy Management, LLC**

CONFIDENTIAL
© 2008 - 2010 Contour Data Solutions, LLC All Rights Reserved

# Contour Data Solutions, LLC
## Master Managed Services Agreement

Contract ID: # 06.25.14 Gridforce Energy Management, LLC

employees or subcontractors, or (ii) the breach of any representation, warranty or covenant made by Contour in this Agreement or any Exhibit.

(b) <u>Customer Indemnity</u>. Customer shall indemnify, defend and hold harmless Contour and its officers, directors, shareholders, employees, agents, successors and assigns (collectively, the "<u>Contour Indemnified Parties</u>"), from any and all Losses in connection with any claim, suit, action or other proceeding brought or threatened by a third party against any of the Contour Indemnified Parties, and relating to, based upon or arising out of or in connection with (i) any gross negligence or willful misconduct on the part of Customer or any of Customer's employees, (ii) the breach of any representation, warranty or covenant made by Customer in this Agreement or any Exhibit, (iii) the products and/or services provided by Customer to its customers or offered by Customer to any prospective customer that are not covered by a representation, warranty or covenant made by Contour in this Agreement, or (iv) the materials, information and/or specific instructions provided by Customer to Contour.

(c) <u>Indemnity Procedures</u>. With respect to indemnification claims, the following procedures shall apply:

   (i)   Promptly after receipt by a party (the "<u>Indemnified Party</u>") of notice of the commencement or threatened commencement of any action or proceeding involving a claim for which such Indemnified Party will seek indemnification pursuant to this Section 8, such Indemnified Party shall notify the other party (the "<u>Indemnifying Party</u>") of such claim in writing.  No failure to so notify an Indemnifying Party shall relieve it of its obligations under this Agreement except to the extent that it can demonstrate damages or prejudice attributable to such failure.  Within ten (10) days following receipt of written notice from the Indemnified Party relating to any claim, but not later than fifteen (15) days before the date on which any response to a complaint or summons is due, the Indemnifying Party shall notify the Indemnified Party in writing if the Indemnifying Party elects to assume control of the defense and settlement of that claim (a "Notice of Election").

   (ii)  If the Indemnifying Party delivers a Notice of Election relating to any claim within the required notice period, the Indemnifying Party shall be entitled to have sole control over the defense and settlement of such claim; provided that (A) the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim, and (B) the Indemnifying Party shall obtain the prior written approval of the Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim.  The Indemnifying Party shall not be required to indemnify the Indemnified Party for any amount paid or payable by the Indemnified Party in the settlement of any claim for which the Indemnifying Party has delivered a timely Notice of Election if such amount was agreed to without the written consent of the Indemnifying Party.

   (iii) If the Indemnifying Party does not deliver a Notice of Election relating to any claim within the required notice period, the Indemnified Party shall have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the Indemnifying Party.  The Indemnifying Party shall promptly reimburse the Indemnified Party for all such costs and expenses including but not limited to any and all reasonable counsel fees.

9.  <u>Warranties; Disclaimer</u>.

(a) <u>Warranties of Contour</u>.  Contour shall perform the Services (i) in a professional manner, (ii) in conformance with that level of care and skill ordinarily exercised in similar circumstances, including services for critical infrastructure, by providers of the same or similar services, and (iii) in compliance with all applicable federal, state and local laws, statutes, rules and regulations.

(b) <u>Disclaimer</u>.  Except as expressly provided in Section 9(a) and the attached Service Level Agreements, the Services are provided to Customer on an "as is" basis, and Contour (i) makes no additional representations or warranties of any kind whatsoever, express or implied, in connection with this Agreement or the Services, (ii) disclaims any warranty that the Services will be error free or uninterrupted or that all errors will be corrected, except to the extent that such errors or interruptions are caused by a failure of Contour to exercise the appropriate level of care, and (iii) disclaims any and all warranties with respect to the Services as to merchantability, accuracy of any information provided, fitness for a particular purpose, title, and non-infringement, and any and all warranties arising from course of dealing or usage of trade, except to the extent such warranties are applicable in exercising the appropriate level of care.  No advice or information, whether oral or written, obtained from Contour or elsewhere shall create any warranty not expressly stated in Section 9(a).

(c) <u>Warranties of Customer</u>.  Customer represents and warrants that it has and will take reasonable precautions to protect Contour's, or Contour's subcontractor's, equipment and environment from infection by a computer virus and shall be responsible for all costs including, but not limited to, repairs, re-builds and/or re-creation of data to bring environment back to its prior state before the infection, that are the direct result of Customers gross negligence or willful misconduct.

10. <u>Limitations on Liability</u>.  Customer acknowledges that the limitations set forth in this Section 10 are integral to the amount of fees levied in connection with this Agreement, and that, were Contour to assume any further liability other than as set forth herein, such fees would of necessity be set substantially higher.

(a) <u>Aggregate Liability</u>.  Customer agrees that Contour's maximum, aggregate liability under this Agreement, for all causes of action and regardless of the form of action (including, but not limited to, breach of contract, tort or any other legal or equitable theory), shall be limited to Customer's direct damages in an amount not to exceed $500,000.

(b) <u>Consequential Damages</u>.  Customer agrees that  Contour's maximum liability under this Agreement, for special, incidental, exemplary, punitive, multiple, consequential or indirect damages (including, but not limited to, damages for loss of goodwill or business profits, loss of revenue, work stoppage, data loss or computer failure or malfunction), whether such damages are alleged in tort, contract or otherwise, even if Contour has been advised of the possibility of such damages, shall be limited to the total amount paid to such party by Customer under this Agreement during the six (6) month period immediately preceding the date of the cause of action.

Contract ID: # 06.25.14 Gridforce Energy Management, LLC

## Contour Data Solutions, LLC
## Master Managed Services Agreement

**Contract ID: # 06.25.14 Gridforce Energy Management, LLC**

11. <u>Non-Solicitation</u>. Neither party shall solicit, interview, make offers of employment or contractor arrangements to any current or former employee or contractor of the other party for a period of twelve (12) months after (i) the termination of this Agreement or (ii) after the employee ceases to be employed or contracted to that party, unless otherwise agreed to, in writing, and signed by an authorized person of the other party. Nothing contained herein shall preclude the solicitation of, or hiring of, any such employee who: (i) the hiring party was in discussion with regarding possibly employment prior to the signing of this Agreement, (ii) responds to a general solicitation of employment through an advertisement not targeted specifically at the non-hiring party or its employees, or (iii) is referred to the hiring party by search firms, employment agencies, or other similar entities, provided that such entities have not been specifically instructed by the hiring party to solicit the employees of the non-hiring party.

12. <u>Miscellaneous</u>.

(a) <u>Force Majeure</u>. Except for Customer's payment obligations under this Agreement, neither party will be liable for any failure or delay in performance under this Agreement which might be due in whole or in part, directly or indirectly, to any contingency, delay, failure, or cause of, any nature beyond the reasonable control of such party. Such causes include, but are not limited to, fire, explosion, earthquake, storm, flood or other weather, unavailability of necessary utilities or raw materials, long term power outage, strike, lockout, unavailability of components, activities of a combination of workmen or other labor difficulties, war, act of terrorism, insurrection, riot, act of God or the public enemy, law, act, order, export control regulation, proclamation decree, regulation, ordinance, or instructions of government or other public authorities, or judgment or decree of a court of competent jurisdiction (not arising out of breach by such party of this Agreement). If, however, a party's performance is prevented for ninety (90) days or more, then the other party will be entitled to terminate this Agreement on written notice to the party suffering the force majeure at any time prior to resumption of performance by the party suffering the force majeure.

(b) <u>Arbitration</u>. If a dispute develops between the parties to this Agreement, they will submit to non-binding mediation to address any controversy or claim arising out of, or relating to this contract or relating to any change orders or other changes or addendums to this contract. Prior to the beginning of the mediation process, the parties may agree that if there is one or more disputed items that remain unresolved at the end of the mediation, the parties will proceed with binding mediation where the mediator will render a final and binding decision on those unresolved items, or the parties may elect to submit the remaining unresolved items to a med-arb procedure where a new and separate binding arbitration session may be scheduled to settle any unresolved issues remaining after the mediation session has been concluded. The parties must mutually agree to utilize binding mediation or arbitration or the parties will be bound only to participate in the non-binding mediation process. The mediation and/or arbitration shall be conducted by and according to the Mediation and/or Arbitration Rules and Procedures of the laws of the Maryland. Any settlement agreement or arbitration award shall be binding upon the parties and shall be enforceable in any court of competent jurisdiction. Both parties shall share the cost of the dispute resolution process equally although personal attorneys and witnesses or specialists are the direct responsibility of each party and their fees and expenses shall be the responsibility of the individual parties.

(c) <u>Severability</u>. If any provision of this Agreement shall be declared by any court of competent jurisdiction to be illegal, void or unenforceable, all other provisions of this Agreement shall not be affected and shall remain in full force and effect to the extent allowed by law.

(d) <u>Assignment</u>. In the event of a merger or acquisition, the parties must assign this agreement and any right or obligation of this agreement to its successor or any entity acquiring all or substantially all of the assets of the Company.

(e) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. This Agreement may be executed by facsimile signature.

(f) <u>Notices</u>. All notices, requests, demands, payments and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given on receipt if delivered personally, upon receipt of a facsimile confirmation if faxed, two days after being sent by a nationally recognized overnight carrier, or three days after being mailed by certified mail, postage prepaid, return receipt requested. Notices shall be sent to the following addresses or to such other address as a party may specify in a notice pursuant to this Section 12(f):

| If to Customer: | If to Contour: |
|---|---|
| Name:<br><br>Gridforce Energy Management, LLC | Name:<br><br>Contour Operations |
| Address:<br><br>1331 Lamar Street<br><br>Suite 560<br><br>Houston, TX 77010 | Address:<br><br>8 Neshaminy Interplex<br><br>Suite 102<br><br>Trevose, PA 19053 |
| Attention:<br><br>James Thompson | Attention:<br><br>Operations |
| Fax#: | Fax#:<br><br>215-245-4110 |

**Contract ID: # 06.25.14 Gridforce Energy Management, LLC**

CONFIDENTIAL<br>© 2008 - 2010 Contour Data Solutions, LLC  All Rights Reserved.

# Contour Data Solutions, LLC
## Master Managed Services Agreement

Contract ID: # 06.25.14 Gridforce Energy Management, LLC

(g)  Waiver.  The waiver by either party of a breach or a default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has, or may have hereunder, operate as a waiver of any right, power or privilege by such party.

(h)  Entire Agreement; Amendment.  This Agreement (i) constitutes the binding agreement between the parties, (ii) represents the entire agreement between the parties and supersedes all prior and/or contemporaneous agreements relating to the subject matter contained herein, and (iii) may not be modified or amended except in a writing signed by the parties.

(i)  Governing Law; Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of Maryland, without regard to its conflicts of laws' principles.  The parties agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement.

(j)  Construction.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.

Contract ID:  # 06.25.14 Gridforce Energy
Management, LLC

# EXHIBIT B

<u>CONTOUR CONFIDENTIAL INFORMATION AND TRADE SECRETS</u>

The below list describes the design, proprietary techniques, and copyrightable/copyrighted work product that constitute Contour's Confidential Information and Trade Secrets and which were created only by Contour for use only by GridForce.

Contour designed, configured, and deployed a highly sophisticated IT network system from and by which GridForce ran its business. The design, configuration, and deployment of the IT network involved the following Confidential Information and Trade Secrets:

- Detailed Visio Diagrams which set forth the design of the entire IT system based upon a list of requirements provided by GridForce, including advanced security requirements.
- Thousands of lines of original, copyrightable/copyrighted source code authored by Contour using Contour's proprietary techniques to create scripts, command line rules, and protocols. This original and copyrightable/copyrighted material:
  - Created a secure network configuration of firewalls, switches, DMZs[1], and routers;
  - Built virtual circuits which permitted the transmission of data and also addressed, among other things, error issues, user congestion, etc.;
  - Determined how and which computers on the network get access to data and have permission to transmit it, which permissions are particular to each user on the IT system:
    - Deployed all security groups and users for applications for user access to the various GridForce databases;
    - Protected GridForce user credentials; and
    - Managed user roles for security access.
  - Automated all aspects of the IT system;
  - Deployed VCenter, which permitted the IT system to manage virtual machines from one, single, centralized location;
  - Ensured 99% availability for the GridForce servers and applications; and
  - Allowed the system to tolerate failure so that downtime for any single server in the Contour-deployed private cloud would be prevented in the event of such failure.

The original, copyrightable/copyrighted source code, scripts, rules, and protocols authored by Contour  - and deployed in the IT system Contour designed – are what made the GridForce IT system an IT system; without Contour's original work product, the system would not have been able to do any of the actions GridForce required.

---

[1] A DMZ adds a further layer of security, acting as an additional network positioned between the internet and here, the GridForce IT system, affording GridForce extra time to identify and address breaches before such breach affected the system; the GridForce IT system required multiple security zones and DMZs; the implementation of the DMZs alone required Contour to author thousands of line of unique and original source code.

# EXHIBIT C

**CONTOUR**

**Service Order Form**

Contract # - 062014-Gridforce-005
Order # - 001

| | |
|---|---|
| Date | 6/26/2014 |
| Company | Gridforce Energy Management LLC |
| Contact | James Thompson |
| Billing Address | 1331 Lamar St, Houston, TX |
| Phone Number | 713-332-2901 |
| Email | t.thompson@constellation.com |
| Effective Date of Service | TBD |
| Extended Term | 60 Months |

| SKU | Service Description | Unit Cost | QTY | Extended MRC | Extended ARC | Extended MRC |
|---|---|---|---|---|---|---|
| CDS-MS-CSTM | Contour Managed Services Custom Configuration - Monthly | $ 79,804.27 | 1 | $ | $ - | $ 79,804.27 |
| CDS-MS-PS | Onboarding and Implementation | $ - | 1 | $ 128,775.00 | $ - | $ - |
| CDS-MS-RunBook | Consulting, Maintenance Services - Yearly: Run Book | $ 14,800.00 | 1 | $ - | $ 14,800.00 | $ - |
| SKU | Additional Services Beyond the Initial Agreement | Unit Cost | QTY | Extended MRC | Extended ARC | Extended MRC |
| CDS-MS-VM | Virtual Machine (Standard Class System) -2 vCPU -4GB Memory -80GB Primary Data Storage -Additional Storage Costs = $1.50/GB -Includes Backup | $ 350.00 | 1 | | | $ - |
| CDS-MS-VM | Virtual Machine (Standard Class System) -4 vCPU -16GB Memory -120GB Primary Data Storage -Additional Storage Costs = $1.50/GB -Includes Backup | $ 600.00 | 1 | | | $ - |
| CDS-MS-ISP | West Coast Internet Service per Mb | $ 16.80 | 1 | | | $ - |
| CDS-MS-ISP | East Coast Internet Service per Mb | $ 16.80 | 1 | | | $ - |
| CDS-MS-P2P | Point to Point Connection to Data Centers per Mb | $ 24.80 | 1 | | | $ - |
| | | | | $ 128,775.00 | $ 14,800.00 | $ 79,804.27 |

| | |
|---|---|
| NON-RECURRING COST | $128,775.00 |
| ANNUAL RECURRING COST | $14,800.00 |
| MONTHLY RECURRING COST | $79,804.27 |

This service order form is used as a guideline based on the customer provided communication to Contour. Customers billing will be based on actual usage. Once billing occurs customer is committed to the terms set forth. Once additional components are added to monthly billing, the contract will extend itself by an additional 36 months.

This Service Order Form is issued pursuant to the terms and conditions set forth in the Master Services Agreement, and addenda thereto, entered into by the parties (or such other software license or service agreement entered into by the parties) and referenced above (the "Master Service Agreement"). By signing below, Customer agrees to be bound by the terms and conditions of this Order Form and the Master Service Agreement."

Contour Data Solutions

Sign

Print Name   Rocco Guerriero, CEO

Title

Date

Gridforce Energy Management

Sign

Print Name

Title

Date

# EXHIBIT D

**CONTOUR**

August 1, 2015


Gridforce Energy Management, LLC

1331 Lamar St, Suite 560

Houston, TX 77010


Re: SOF replacement


Dear JT,

Enclosed please find the executed Service Order Form for Private Cloud Infrastructure. This Service
Order #062014-007 amends and restates in its entirety Service Order #062014-Gridforce-005. All terms
and conditions set forth in MSA #06.24.2019 Gridforce Energy Management, LLC and in Service Order
#062014-Gridforce-005 remain in effect and are unchanged.


Sincerely,

Rocco Guerriero

**CONTOUR**

| | Service Order Form |
|---|---|
| | Contract # 062014-007 |
| | Order # 007 |

| | |
|---|---|
| Date | 7/27/2015 |
| Company | Gridforce Energy Management |
| Contact | JT Thompson / Denise Ayers |
| Billing Address | 1331 Lamar St, Suite 560, Houston TX |
| Phone Number | 713.303.8399 |
| Email | denisea@grid4ce.net |
| Effective Date of Service | 8/1/2015 |
| Extended Term: | 60 Months |

| SKU | Service Description 8/1/2015-1/1/2016 | Unit Cost | QTY | Extended NRC | Extended MRC |
|---|---|---|---|---|---|
| CDS-MS-Private Cloud-DL | Directlink Data Center - (Networking, Licensing, Storage, Servers, Managed Services) | $ 33,202.89 | 1 | $ - | $ 33,202.89 |
| CDS-MS-Circuit-DL | Comcast | $ 3,545.00 | 1 | $ - | $ 3,545.00 |
| CDS-MS-Private Cloud-C7 | C7 Data Center - (Networking, Licensing, Storage, Servers, Phone System, Managed Services) | $ 33,202.89 | 1 | $ - | $ 33,202.89 |
| CDS-MS-Private Cloud-Houston | Houston - (Networking, Licensing, Storage, Servers, Phone System, Managed Services) | $ 16,601.45 | 1 | $ - | $ 16,601.45 |
| CDS-MS-Private Cloud-Helpdesk | Helpdesk Services | $ 750.00 | 1 | $ - | $ 750.00 |
| | | | | ONE TIME COST/SET UP FEE | $0.00 |
| | | | | TOTAL MONTHLY SUBSCRIPTION | $87,302.23 |

| SKU | Service Description 1/1/2016-8/1/2020 | Unit Cost | QTY | Extended NRC | Extended MRC |
|---|---|---|---|---|---|
| CDS-MS-Project | Additional Implementation Costs | $ 3,449.35 | 1 | | $ 3,449.35 |
| CDS-MS-Private Cloud-DL | Directlink Data Center - (Networking, Licensing, Storage, Servers, Managed Services) | $ 37,302.01 | 1 | | $ 37,302.01 |
| CDS-MS-Circuit-DL | Comcast | $ 3,545.00 | 1 | | $ 3,545.00 |
| CDS-MS-Private Cloud-C7 | C7 Data Center - (Networking, Licensing, Storage, Servers, Phone System, Managed Services) | $ 37,302.01 | 1 | | $ 37,302.01 |
| CDS-MS-Private Cloud-Houston | Houston - (Networking, Licensing, Storage, Servers, Phone System, Managed Services) | $ 18,651.01 | 1 | | $ 18,651.01 |
| CDS-MS-Private Cloud-Helpdesk | Helpdesk Services | $ 750.00 | 1 | | $ 750.00 |
| | | | | ONE TIME COST/SET UP FEE | $0.00 |
| | | | | TOTAL MONTHLY SUBSCRIPTION | $100,999.38 |

This Service Order Form is issued pursuant to the terms and conditions set forth in the Master Services Agreement, and addenda thereto, entered into by the parties (or such other software license or service agreement entered into by the parties) and referenced above (the "Master Service Agreement"). By signing below, Customer agrees to be bound by the terms and conditions of this Order Form and the Master Service Agreement."

| Contour Data Solutions | | Gridforce Energy Management | |
|---|---|---|---|
| Sign | | Sign | |
| Print Name | Rocco Guerriero, CEO | Print Name | JT Thompson |
| Title | | Title | President |
| Date | 8/11/2015 | Date | 8/11/2015 |

# EXHIBIT E



# Billing Change Request Form

| | |
|---|---|
| Customer Name: **Gridforce Energy** | Date Submitted: 2/4/2019 |
| Requestor: **Denise Ayers** | Phone#: **713.332.2902** | Email: **Denise.ayers@grid4ce.net** |

**CHANGE TYPE:** New Requirement: ☒  Requirement Change: ☐  Design Change: ☐  Other: _____

**REASON:** Cross Connect Cable for two new circuits at DataBank

**PRIORITY:** Emergency: ☐   Urgent: ☒   Routine: ☐   *Date Required by: 2/5/2019*

**RISK LEVEL:** High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

DataBank engineer to run a cross connect to the Gridforce cage at the data center for two new circuits.  One of the cross connects was completed in December, the cross connect for SPP still needs to be ran.

**Attachments:** SOF Attached

**COSTS ASSOCIATED:**

Set up fee $300.00 – Databank charges a fee to run the cross connect cables
Monthly - $400.00 – Databank charges $200 a month per cross connect cable.

**APPROVALS:**    Change Approved: ☒    Change Not Approved: ☐    Hold (Future Enhancement): ☐

1. Signature : *Denise A*
   —D48642DC1AA74CB—
   Print : **Denise        Ayers**
   Date : Click here to enter a date. 2/4/2019

2. Signature : *Nicole Schoenewald*
   —41A5BBBB797C44B—
   Print : **Nicole Schoenewald**
   Date : Click here to enter a date. 2/4/2019

*CONFIDENTIAL*: This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.



# Billing Change Request Form

| | |
|---|---|
| Customer Name: | Gridforce Energy | Date Submitted: 2/28/2019 |
| Requestor: | Denise Ayers   Phone#: 713.332.2902   Email: Denise.ayers@grid4ce.net |

**CHANGE TYPE:**  New Requirement: ☒   Requirement Change: ☐   Design Change: ☐   Other: _____

**REASON:**  Cross Connect Cable for CenturyLink needed at DataBank for SPP

**PRIORITY:**  Emergency: ☐   Urgent: ☒   Routine: ☐   *Date Required by: 2/5/2019*

**RISK LEVEL:**  High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

DataBank engineer to run a cross connect to the Gridforce cage at the data center for the CenturyLink circuit for SPP

*Attachments:*  SOF Attached

**COSTS ASSOCIATED:**

Setup fee $150.00 – Databank charges a fee to run the cross connect cables
Monthly - $200.00 – Databank charges $200 a month per cross connect cable.

**APPROVALS:**   Change Approved: ☒   Change Not Approved: ☐   Hold (Future Enhancement): ☐

1. Signature :  *Denise Ayers* (DocuSigned by) — D48642DC1AA74CB...        Date : 3/4/2019  Click here to enter a date.

Print :  Denise Ayers

2. Signature :  *Nicole Schoenewald* (DocuSigned by) — 41A5BBBB797C44B...        Date : 3/6/2019  Click here to enter a date.

Print :  Nicole Schoenewald

*CONFIDENTIAL:* **This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.**



# Billing Change Request Form

| | | | |
|---|---|---|---|
| Customer Name: | Gridforce Energy | Date Submitted: 9/5/2019 | |
| Requestor: | Denise Ayers | Phone#: 713.332.2902 | Email: Denise.ayers@grid4ce.net |

**CHANGE TYPE:**  New Requirement: ☒   Requirement Change: ☐   Design Change: ☐   Other: _____

**REASON:**  Cross Connect Cable for new circuit at DataBank

**PRIORITY:**   Emergency: ☐   Urgent: ☒   Routine: ☐   *Date Required by: 9/6/2019*

**RISK LEVEL:**   High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

DataBank engineer to run a cross connect to the Gridforce cage at the data center for a new circuit.

*Attachments:* SOF Attached

**COSTS ASSOCIATED:**

Set up fee $150.00 – Databank charges a fee to run the cross connect cable.
Monthly - $200.00 – Databank charges $200 a month per cross connect cable.
Initial term  - 12 months

**APPROVALS:**   Change Approved: ☒   Change Not Approved: ☐   Hold (Future Enhancement): ☐

| | | |
|---|---|---|
| 1. Signature : | *Denise Ayers*  (DocuSigned by) D48642DC1AA74CB... | Date : ~~Click or tap to enter a date.~~ 9/6/2019 |
| Print : | Denise Ayers | |
| 2. Signature : | Nicole Schoenewald  (DocuSigned by) 41A5BBBB797C44B... | Date : ~~Click or tap to enter a date.~~ 9/11/2019 |
| Print : | Nicole Schoenewald | |

*CONFIDENTIAL*: **This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.**



# Billing Change Request Form

| | |
|---|---|
| Customer Name: | Gridforce Energy |
| | Date Submitted: 9/13/2019 |
| Requestor: | Ed Angus   Phone#: 713.332.2945   Email: Edward.Angus@grid4ce.net |

**CHANGE TYPE:**  New Requirement: ☒   Requirement Change: ☐   Design Change: ☐   Other: _____

**REASON:**  Ed is requesting a 2019 Window Server Standard license.

**PRIORITY:**   Emergency: ☐   Urgent: ☐   Routine: ☒   *Date Required by: 9/13/2019*

**RISK LEVEL:**   High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

Contour will apply the license to the new VM when we receive the license key

*Attachments:* SOF Attached

**COSTS ASSOCIATED:**

The license key is $46/per month.

**APPROVALS:**   Change Approved: ☒   Change Not Approved: ☐   Hold (Future Enhancement): ☐

| | | |
|---|---|---|
| 1. Signature : | *Denise Ayers* (DocuSigned by, 711A75131BC546B...) | Date : 9/13/2019 ~~Click or tap to enter a date.~~ |
| Print : | Denise Ayers | |
| 2. Signature : | *Nicole Schoenewald* (DocuSigned by, 41A5BBBB797C44B...) | Date : 9/13/2019 ~~Click or tap to enter a date.~~ |
| Print : | Nicole Schoenewald | |

*CONFIDENTIAL:* **This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.**

DocuSign Envelope ID: 046D4519-636A-4FB7-A636-CF101B22F31D



*CONFIDENTIAL*: **This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.**



# Billing Change Request Form

| | |
|---|---|
| Customer Name: | Gridforce Energy |
| | Date Submitted: 9/26/2019 |
| Requestor: | Ed Angus |
| Phone#: | 713.332.2945 |
| Email: | Edward.Angus@grid4ce.net |

**CHANGE TYPE:**  New Requirement: ☒   Requirement Change: ☐   Design Change: ☐   Other: _____

**REASON:**  Ed is requesting a 2016 Window Server Standard license.

**PRIORITY:**   Emergency: ☐   Urgent: ☐   Routine: ☒   *Date Required by: 9/26/2019*

**RISK LEVEL:**   High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

Contour will apply the license to the new VM when we receive the license key

**Attachments:** SOF Attached

**COSTS ASSOCIATED:**

The license key is $46/per month.

**APPROVALS:**       Change Approved: ☒     Change Not Approved: ☐      Hold (Future Enhancement): ☐

1. Signature :   *Denise Ayers*
   711A751316C546B...

   Date : 9/26/2019

   Print :   Denise Ayers

2. Signature :   *Nicole Schoenewald*
   41A5BBBB797C44B...

   Date : 9/26/2019

   Print :   Nicole Schoenewald

*CONFIDENTIAL*: This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.



# Billing Change Request Form

| | |
|---|---|
| Customer Name: | Gridforce Energy |
| | Date Submitted: 10/16/2019 |
| Requestor: | Ed Angus |
| Phone#: | 713.332.2945 |
| Email: | Edward.Angus@grid4ce.net |

**CHANGE TYPE:**   New Requirement: ☒   Requirement Change: ☐   Design Change: ☐   Other: _____

**REASON:**   Ed is requesting a 2016 Window Server Standard license.

**PRIORITY:**   Emergency: ☐   Urgent: ☐   Routine: ☒   *Date Required by: 10/17/2019*

**RISK LEVEL:**   High (Impact Expected): ☐   Medium (Impact Possible): ☐   Low (Impact Not Expected): ☒

**RISK DESCRIPTION:**

N/A

**CHANGE DESCRIPTION:**

Contour will apply the license to the new VM when we receive the license key

*Attachments:* SOF Attached

**COSTS ASSOCIATED:**

The license key is $46/per month.

**APPROVALS:**   Change Approved: ☒   Change Not Approved: ☐   Hold (Future Enhancement): ☐

1. Signature :   *Denise Ayers*
DocuSigned by:
—D48642DC1AA74CB...

Date : 10/16/2019

Print :   Denise Ayers

2. Signature :   *Nicole Schoenewald*
DocuSigned by:
—41A5BBBB797C44B...

Date : 10/17/2019

Print :   Nicole Schoenewald

*CONFIDENTIAL*: This document is the property of Contour LLC.  Unauthorized use of this document is prohibited.

# EXHIBIT F

Contour Data Solutions, LLC
A/R Aging Details (Gridforce)
As of 06.29.2020

| date | customer_name | transaction_number | due_date | balance | | amount | |
|---|---|---|---|---|---|---|---|
| 2019-09-10 | Gridforce Energy Management | 00005275 | 2019-10-10 | $ | 891.18 | $ | 891.18 |
| 2019-09-30 | Gridforce Energy Management | 00005313 | 2019-10-30 | $ | 31,763.18 | $ | 31,763.18 |
| 2019-09-30 | Gridforce Energy Management | 00005310 | 2019-10-30 | $ | 981.19 | $ | 981.19 |
| 2019-09-30 | Gridforce Energy Management | 00005301 | 2019-10-30 | $ | 222.79 | $ | 222.79 |
| 2019-10-31 | Gridforce Energy Management | 00005454 | 2019-11-30 | $ | 984.60 | $ | 984.60 |
| 2019-10-31 | Gridforce Energy Management | 00005445 | 2019-11-30 | $ | 222.79 | $ | 222.79 |
| 2019-10-31 | Gridforce Energy Management | 00005457 | 2019-11-30 | $ | 31,898.70 | $ | 31,898.70 |
| 2019-11-30 | Gridforce Energy Management | 00005565 | 2019-12-30 | $ | 222.79 | $ | 222.79 |
| 2019-11-30 | Gridforce Energy Management | 00005577 | 2019-12-30 | $ | 31,898.70 | $ | 31,898.70 |
| 2019-11-30 | Gridforce Energy Management | 00005574 | 2019-12-30 | $ | 984.60 | $ | 984.60 |
| 2019-12-31 | Gridforce Energy Management | 00005689 | 2020-01-30 | $ | 2,234.47 | $ | 2,234.47 |
| 2019-12-31 | Gridforce Energy Management | 00005682 | 2020-01-30 | $ | 31,040.61 | $ | 31,040.61 |
| 2019-12-31 | Gridforce Energy Management | 00005688 | 2020-01-30 | $ | 1,045.85 | $ | 1,045.85 |
| 2019-12-31 | Gridforce Energy Management | 00005694 | 2020-01-30 | $ | 92.44 | $ | 92.44 |
| 2019-12-31 | Gridforce Energy Management | 00005681 | 2020-02-14 | $ | 101,937.38 | $ | 101,937.38 |
| 2019-12-31 | Gridforce Energy Management | 00005687 | 2020-01-30 | $ | 1,821.61 | $ | 1,821.61 |
| 2019-12-31 | Gridforce Energy Management | 00005693 | 2020-01-30 | $ | 42.64 | $ | 42.64 |
| 2019-12-31 | Gridforce Energy Management | 00005686 | 2020-01-30 | $ | 1,493.73 | $ | 1,493.73 |
| 2019-12-31 | Gridforce Energy Management | 00005692 | 2020-01-30 | $ | 963.05 | $ | 963.05 |
| 2019-12-31 | Gridforce Energy Management | 00005685 | 2020-01-30 | $ | 439.81 | $ | 439.81 |
| 2019-12-31 | Gridforce Energy Management | 00005691 | 2020-01-30 | $ | 748.52 | $ | 748.52 |
| 2019-12-31 | Gridforce Energy Management | 00005684 | 2020-01-30 | $ | 562.02 | $ | 562.02 |
| 2019-12-31 | Gridforce Energy Management | 00005690 | 2020-01-30 | $ | 748.52 | $ | 748.52 |
| 2019-12-31 | Gridforce Energy Management | 00005683 | 2020-01-30 | $ | 222.79 | $ | 222.79 |
| 2020-01-07 | Gridforce Energy Management | 00005737 | 2020-01-14 | $ | 496.59 | $ | 496.59 |
| 2020-01-07 | Gridforce Energy Management | 00005732 | 2020-01-14 | $ | 496.59 | $ | 496.59 |
| 2020-01-07 | Gridforce Energy Management | 00005725 | 2020-01-14 | $ | 508.26 | $ | 508.26 |
| 2020-01-31 | Gridforce Energy Management | 00005822 | 2020-03-01 | $ | 17,695.56 | $ | 17,695.56 |

| Date | Vendor | Check # | Date | Amount | Amount |
|---|---|---|---|---|---|
| 2020-01-31 | Gridforce Energy Management | 00005804 | 2020-03-01 | $ 1,821.61 | $ 1,821.61 |
| 2020-01-31 | Gridforce Energy Management | 00005810 | 2020-03-01 | $ 42.64 | $ 42.64 |
| 2020-01-31 | Gridforce Energy Management | 00005821 | 2020-03-16 | $ 101,937.38 | $ 101,937.38 |
| 2020-01-31 | Gridforce Energy Management | 00005803 | 2020-03-01 | $ 1,493.73 | $ 1,493.73 |
| 2020-01-31 | Gridforce Energy Management | 00005809 | 2020-03-01 | $ 963.05 | $ 963.05 |
| 2020-01-31 | Gridforce Energy Management | 00005802 | 2020-03-01 | $ 439.81 | $ 439.81 |
| 2020-01-31 | Gridforce Energy Management | 00005808 | 2020-03-01 | $ 748.52 | $ 748.52 |
| 2020-01-31 | Gridforce Energy Management | 00005801 | 2020-03-01 | $ 562.02 | $ 562.02 |
| 2020-01-31 | Gridforce Energy Management | 00005807 | 2020-03-01 | $ 748.52 | $ 748.52 |
| 2020-01-31 | Gridforce Energy Management | 00005800 | 2020-03-01 | $ 222.79 | $ 222.79 |
| 2020-01-31 | Gridforce Energy Management | 00005806 | 2020-03-01 | $ 2,234.47 | $ 2,234.47 |
| 2020-01-31 | Gridforce Energy Management | 00005812 | 2020-03-01 | $ 31,040.61 | $ 31,040.61 |
| 2020-01-31 | Gridforce Energy Management | 00005805 | 2020-03-01 | $ 1,045.85 | $ 1,045.85 |
| 2020-01-31 | Gridforce Energy Management | 00005811 | 2020-03-01 | $ 92.44 | $ 92.44 |
| 2020-02-04 | Gridforce Energy Management | 00005818 | 2020-02-11 | $ 621.86 | $ 621.86 |
| 2020-02-19 | Gridforce Energy Management | 00005907 | 2020-02-26 | $ 1,529.06 | $ 1,529.06 |
| 2020-02-19 | Gridforce Energy Management | 00005906 | 2020-02-26 | $ 22.52 | $ 22.52 |
| 2020-02-19 | Gridforce Energy Management | 00005905 | 2020-02-26 | $ 496.59 | $ 496.59 |
| 2020-02-19 | Gridforce Energy Management | 00005904 | 2020-02-26 | $ 496.59 | $ 496.59 |
| 2020-02-19 | Gridforce Energy Management | 00005903 | 2020-02-26 | $ 507.88 | $ 507.88 |
| 2020-02-29 | Gridforce Energy Management | 00005933 | 2020-03-30 | $ 1,821.61 | $ 1,821.61 |
| 2020-02-29 | Gridforce Energy Management | 00005932 | 2020-03-30 | $ 1,493.73 | $ 1,493.73 |
| 2020-02-29 | Gridforce Energy Management | 00005938 | 2020-03-30 | $ 963.05 | $ 963.05 |
| 2020-02-29 | Gridforce Energy Management | 00005944 | 2020-03-30 | $ 17,695.56 | $ 17,695.56 |
| 2020-02-29 | Gridforce Energy Management | 00005931 | 2020-03-30 | $ 439.81 | $ 439.81 |
| 2020-02-29 | Gridforce Energy Management | 00005937 | 2020-03-30 | $ 748.52 | $ 748.52 |
| 2020-02-29 | Gridforce Energy Management | 00005943 | 2020-04-14 | $ 101,937.38 | $ 101,937.38 |
| 2020-02-29 | Gridforce Energy Management | 00005930 | 2020-03-30 | $ 562.02 | $ 562.02 |
| 2020-02-29 | Gridforce Energy Management | 00005936 | 2020-03-30 | $ 748.52 | $ 748.52 |
| 2020-02-29 | Gridforce Energy Management | 00005942 | 2020-03-30 | $ 31,040.61 | $ 31,040.61 |
| 2020-02-29 | Gridforce Energy Management | 00005929 | 2020-03-30 | $ 222.79 | $ 222.79 |
| 2020-02-29 | Gridforce Energy Management | 00005935 | 2020-03-30 | $ 2,234.47 | $ 2,234.47 |
| 2020-02-29 | Gridforce Energy Management | 00005941 | 2020-03-30 | $ 42.64 | $ 42.64 |
| 2020-02-29 | Gridforce Energy Management | 00005934 | 2020-03-30 | $ 1,045.85 | $ 1,045.85 |

| Date | Vendor | Invoice | Date | Amount | Amount |
|---|---|---|---|---|---|
| 2020-02-29 | Gridforce Energy Management | 00005940 | 2020-03-30 | $ 92.44 | $ 92.44 |
| 2020-03-10 | Gridforce Energy Management | 00006013 | 2020-03-17 | $ 887.29 | $ 887.29 |
| 2020-03-31 | Gridforce Energy Management | 00006063 | 2020-04-30 | $ 2,234.47 | $ 2,234.47 |
| 2020-03-31 | Gridforce Energy Management | 00006071 | 2020-04-30 | $ 17,695.56 | $ 17,695.56 |
| 2020-03-31 | Gridforce Energy Management | 00006056 | 2020-04-30 | $ 31,040.61 | $ 31,040.61 |
| 2020-03-31 | Gridforce Energy Management | 00006062 | 2020-04-30 | $ 1,045.85 | $ 1,045.85 |
| 2020-03-31 | Gridforce Energy Management | 00006070 | 2020-04-30 | $ 92.44 | $ 92.44 |
| 2020-03-31 | Gridforce Energy Management | 00006061 | 2020-04-30 | $ 1,821.61 | $ 1,821.61 |
| 2020-03-31 | Gridforce Energy Management | 00006069 | 2020-04-30 | $ 42.64 | $ 42.64 |
| 2020-03-31 | Gridforce Energy Management | 00006060 | 2020-04-30 | $ 1,493.73 | $ 1,493.73 |
| 2020-03-31 | Gridforce Energy Management | 00006068 | 2020-04-30 | $ 963.05 | $ 963.05 |
| 2020-03-31 | Gridforce Energy Management | 00006059 | 2020-04-30 | $ 439.81 | $ 439.81 |
| 2020-03-31 | Gridforce Energy Management | 00006067 | 2020-04-30 | $ 748.52 | $ 748.52 |
| 2020-03-31 | Gridforce Energy Management | 00006058 | 2020-04-30 | $ 562.02 | $ 562.02 |
| 2020-03-31 | Gridforce Energy Management | 00006064 | 2020-04-30 | $ 748.52 | $ 748.52 |
| 2020-03-31 | Gridforce Energy Management | 00006057 | 2020-04-30 | $ 222.79 | $ 222.79 |
| 2020-04-07 | Gridforce Energy Management | 00006138 | 2020-04-14 | $ 887.29 | $ 887.29 |
| 2020-04-07 | Gridforce Energy Management | 00006135 | 2020-04-14 | $ 1,529.06 | $ 1,529.06 |
| 2020-04-29 | Gridforce Energy Management | 00006185 | 2020-05-06 | $ 1,529.06 | $ 1,529.06 |
| 2020-05-06 | Gridforce Energy Management | 00006272 | 2020-05-13 | $ 1,243.72 | $ 1,243.72 |
| 2020-05-06 | Gridforce Energy Management | 00006278 | 2020-05-13 | $ 887.29 | $ 887.29 |
| 2020-05-06 | Gridforce Energy Management | 00006271 | 2020-05-13 | $ 993.18 | $ 993.18 |
| 2020-05-06 | Gridforce Energy Management | 00006277 | 2020-05-13 | $ 1,529.06 | $ 1,529.06 |
| 2020-05-06 | Gridforce Energy Management | 00006270 | 2020-05-13 | $ 993.18 | $ 993.18 |
| 2020-05-06 | Gridforce Energy Management | 00006276 | 2020-05-13 | $ 887.29 | $ 887.29 |
| 2020-05-06 | Gridforce Energy Management | 00006268 | 2020-05-13 | $ 1,015.76 | $ 1,015.76 |
| 2020-05-06 | Gridforce Energy Management | 00006275 | 2020-05-13 | $ 1,529.06 | $ 1,529.06 |
| 2020-05-06 | Gridforce Energy Management | 00006274 | 2020-05-13 | $ 887.29 | $ 887.29 |
| 2020-05-06 | Gridforce Energy Management | 00006273 | 2020-05-13 | $ 3,058.12 | $ 3,058.12 |
| 2020-05-21 | Gridforce Energy Management | 00006055 | 2020-05-15 | $ 101,937.38 | $ 101,937.38 |
| 2020-05-21 | Gridforce Energy Management | 00006301 | 2020-05-28 | $ 507.88 | $ 507.88 |
| 2020-05-21 | Gridforce Energy Management | 00006304 | 2020-05-28 | $ 621.86 | $ 621.86 |
| 2020-05-21 | Gridforce Energy Management | 00006303 | 2020-05-28 | $ 496.59 | $ 496.59 |
| 2020-05-21 | Gridforce Energy Management | 00006302 | 2020-05-28 | $ 496.59 | $ 496.59 |

| Date | Vendor | Invoice | Date | | Amount | | Amount |
|---|---|---|---|---|---|---|---|
| 2020-05-22 | Gridforce Energy Management | 00006310 | 2020-05-29 | $ | 1,529.06 | $ | 1,529.06 |
| 2020-05-22 | Gridforce Energy Management | 00006309 | 2020-05-29 | $ | 887.29 | $ | 887.29 |
| 2020-05-22 | Gridforce Energy Management | 00006308 | 2020-05-29 | $ | 1,529.06 | $ | 1,529.06 |
| 2020-04-30 | Gridforce Energy Management | 00006199 | 2020-05-30 | $ | 92.44 | $ | 92.44 |
| 2020-04-30 | Gridforce Energy Management | 00006192 | 2020-05-30 | $ | 1,801.83 | $ | 1,801.83 |
| 2020-04-30 | Gridforce Energy Management | 00006198 | 2020-05-30 | $ | 42.64 | $ | 42.64 |
| 2020-04-30 | Gridforce Energy Management | 00006191 | 2020-05-30 | $ | 1,475.43 | $ | 1,475.43 |
| 2020-04-30 | Gridforce Energy Management | 00006197 | 2020-05-30 | $ | 953.99 | $ | 953.99 |
| 2020-04-30 | Gridforce Energy Management | 00006190 | 2020-05-30 | $ | 439.81 | $ | 439.81 |
| 2020-04-30 | Gridforce Energy Management | 00006196 | 2020-05-30 | $ | 742.23 | $ | 742.23 |
| 2020-04-30 | Gridforce Energy Management | 00006189 | 2020-05-30 | $ | 562.02 | $ | 562.02 |
| 2020-04-30 | Gridforce Energy Management | 00006195 | 2020-05-30 | $ | 742.23 | $ | 742.23 |
| 2020-04-30 | Gridforce Energy Management | 00006188 | 2020-05-30 | $ | 222.79 | $ | 222.79 |
| 2020-04-30 | Gridforce Energy Management | 00006194 | 2020-05-30 | $ | 2,209.00 | $ | 2,209.00 |
| 2020-04-30 | Gridforce Energy Management | 00006200 | 2020-05-30 | $ | 17,695.56 | $ | 17,695.56 |
| 2020-04-30 | Gridforce Energy Management | 00006187 | 2020-05-30 | $ | 30,679.36 | $ | 30,679.36 |
| 2020-04-30 | Gridforce Energy Management | 00006193 | 2020-05-30 | $ | 1,036.61 | $ | 1,036.61 |
| 2020-04-30 | Gridforce Energy Management | 00006186 | 2020-06-14 | $ | 101,937.38 | $ | 101,937.38 |
| 2020-06-18 | Gridforce Energy Management | INV-000124 | 2020-06-25 | $ | 1,529.06 | $ | 1,529.06 |
| 2020-06-24 | Gridforce Energy Management | INV-000135 | 2020-07-01 | $ | 507.88 | | 507.88 |
| 2020-06-25 | Gridforce Energy Management | INV-000136 | 2020-07-02 | | 496.59 | | 496.59 |
| 2020-06-25 | Gridforce Energy Management | INV-000142 | 2020-07-02 | | 1,529.06 | | 1,529.06 |
| 2020-06-25 | Gridforce Energy Management | INV-000141 | 2020-07-02 | | 887.29 | | 887.29 |
| 2020-06-25 | Gridforce Energy Management | INV-000140 | 2020-07-02 | | 887.29 | | 887.29 |
| 2020-06-25 | Gridforce Energy Management | INV-000146 | 2020-07-02 | | 1,529.06 | | 1,529.06 |
| 2020-06-25 | Gridforce Energy Management | INV-000139 | 2020-07-02 | | 1,529.06 | | 1,529.06 |
| 2020-06-25 | Gridforce Energy Management | INV-000145 | 2020-07-02 | | 880.44 | | 880.44 |
| 2020-06-25 | Gridforce Energy Management | INV-000138 | 2020-07-02 | | 621.86 | | 621.86 |
| 2020-06-25 | Gridforce Energy Management | INV-000144 | 2020-07-02 | | 1,529.06 | | 1,529.06 |
| 2020-06-25 | Gridforce Energy Management | INV-000137 | 2020-07-02 | | 496.59 | | 496.59 |
| 2020-06-25 | Gridforce Energy Management | INV-000143 | 2020-07-02 | | 887.29 | | 887.29 |

Unpaid invoices and late fees through 2/7/2020 $ 406,676.26

Late Fees on unpaid invoices for services through 2/7/2020 $ 22,738.78

Total

$ 429,415.04