**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CONTOUR DATA SOLUTIONS LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>GRIDFORCE ENERGY MANAGEMENT LLC, NAES CORPORATION, CDW CORPORATION, CDW DIRECT, LLC, JOHN AND JANE DOES 1 5, and ABC COS. 1 5,<br><br>        Defendants. | Civil Action No. 2:20-CV-03241-CMR |

**DEFENDANTS CDW CORPORATION AND CDW DIRECT, LLC'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF CONTOUR DATA SOLUTIONS LLC'S
SECOND AMENDED VERIFIED COMPLAINT**

Defendants CDW Corporation and CDW Direct, LLC (collectively, "CDW"), by and through the undersigned attorneys, for their Answer and Affirmative Defenses to Plaintiff Contour Data Solutions LLC's Second Amended Verified Complaint ("Complaint"), state as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because this action, in part, arises under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), the Federal Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*)*,* and the Federal Stored Communications Act (18 U.S.C. § 2701 *et seq.).* This Court may exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 since these claims are closely related to the federal claims so as to form the same case or controversy.

**ANSWER: CDW denies that Plaintiff Contour Data Solutions LLC ("Contour") has brought any claims under the Defend Trade Secrets Act (18 U.S.C. §§ 1836 *et seq.*), the**

**Federal Computer Fraud and Abuse Act (**18 U.S.C. § 1030 *et seq.***) and the Federal Stored Communications Act (**18 U.S.C. § 2701 *et seq.***) against CDW.  CDW, therefore, denies that this Court may exercise jurisdiction pursuant to 28 U.S.C. § 1331.  Answering further, CDW asserts that this Court may decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) because the state claims substantially predominate over the Defend Trade Secrets Act claim.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 1, including the citizenship of the members of Contour such that CDW could determine if there is diversity jurisdiction, and, therefore, denies those allegations.**

2.      This Court has personal jurisdiction over Defendants because Defendants transact business, contract to supply things, and/or cause harm and tortious injury in the Commonwealth of Pennsylvania. Defendants have purposefully availed themselves of the laws of Pennsylvania and engaged in continuous and systematic conduct in Pennsylvania and this judicial district.

**ANSWER: CDW admits that CDW Direct, LLC transacts business in the Commonwealth of Pennsylvania.  CDW denies all remaining allegations contained in Paragraph No. 2 as they related to CDW.  CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 2 with respect to other Defendants and, therefore, denies those allegations.**

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**ANSWER: CDW admits that venue is proper as to it in this Court for this action.**

## PARTIES

4.      Contour is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with a principal place of business at 4259 W. Swamp Road, Suite 301, Doylestown, Pennsylvania 18902.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 4 and, therefore, denies those allegations.**

5.      Upon information and belief, Gridforce is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 1301 Fannin Street, Suite 1000, Houston, Texas 77002.

**ANSWER: Upon information and belief, CDW admits the allegations contained in Paragraph No. 5.**

6.      Upon information and belief, NAES is a corporation organized under the laws of the State of Washington with a principal place of business at 1180 NW Maple Street, Suite 200, Issaquah, Washington 98027.

**ANSWER: Upon information and belief, CDW admits the allegations contained in Paragraph No. 6.**

7.      Upon information and belief, CDW Corporation is a corporation organized under the laws of the State of Delaware with a principal place of business at 75 Tri-State International, Lincolnshire, Illinois 60069.

**ANSWER: CDW Corporation admits that it is a corporation organized under the laws of the State of Delaware and that its principal place of business is in the State of Illinois.  CDW Corporation denies the remaining allegations contained in Paragraph No. 7.**

8.      Upon information and belief, CDW Direct, LLC is a limited liability company organized under the laws of the State of Illinois with a principal place of business at 75 Tri-State International, Lincolnshire, Illinois 60069 and is a wholly-owned subsidiary of CDW Corporation.

**ANSWER: CDW admits that CDW Direct, LLC is a limited liability company organized under the laws of the State of Illinois with its principal place of business in the State of**

Illinois.  CDW further admits that CDW Direct, LLC is an indirect wholly-owned subsidiary of CDW Corporation.   CDW denies the remaining allegations contained in Paragraph No 8.

9.      Upon information and belief, Doe Defendants are individuals, past or present, who received or used the Confidential Information and Trade Secrets referenced herein and described more specifically below. The Doe Defendants will be identified in the course of discovery and substituted as party defendants for the Doe Defendants.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 9 and, therefore, denies those allegations.**

10.      Upon information and belief, ABC Defendants are legal entities, past or present, that received or used the Confidential Information and Trade Secrets referenced herein and described more specifically below. The ABC Defendants will be identified in the course of discovery and substituted as party defendants for the ABC Defendants.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 10 and, therefore, denies those allegations.**

## FACTUAL BACKGROUND

### CONTOUR

11.      Contour is one of the fastest growing technology companies in the Delaware Valley region, servicing an array of industries and businesses by deploying enterprise-based technologies in secure cloud experiences.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 11 and, therefore, denies those allegations.**

12.      Contour works closely with its clients to identify the client's goals, budget constraints, technology integration issues, and problem areas to develop and build an information technology ("IT") strategy and entirely unique system for that client.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 12 and, therefore, denies those allegations.**

13.     Whether the client requires cloud solutions, a managed services suite, or integration services, Contour is nationally recognized and respected as being at the forefront of this technology field.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 13 and, therefore, denies those allegations.**

## GRIDFORCE

14.     Upon information and belief, Gridforce provides energy control and integration management services to electric micro-grids, load-serving entities, and demand response clients in North America.

**ANSWER: Upon information and belief, CDW admits the allegations contained in Paragraph No. 14.**

15.     Gridforce is a wholly-owned subsidiary of NAES.

**ANSWER: Upon information and belief, CDW admits the allegations contained in Paragraph No. 15.**

## NAES

16.     Upon information and belief, NAES provides construction services to the power generation, oil and gas, and petrochemical industries.

**ANSWER: Upon information and belief, CDW admits the allegations contained in Paragraph No. 16.**

17.     NAES is a wholly-owned subsidiary of ITOCHU Corporation. Upon information and belief, ITOCHU Corporation ranks among the world's largest corporations.

**ANSWER: Upon information and belief, CDW admits the allegations contained in the first sentence of Paragraph No. 17. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 17 and, therefore, denies those allegations.**

18.     Upon information and belief, NAES generates approximately $1.09 billion in sales annually.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 18 and, therefore, denies those allegations.**

19.     Upon information and belief, NAES acquired Gridforce in/around July 2017.

**ANSWER: Upon information and belief, CDW admits that NAES acquired Gridforce. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 19, including the date of the acquisition, and, therefore, denies those allegations.**

20.     Upon information and belief, NAES has maintained and continues to maintain significant control over Gridforce's financial, day-to-day, and long-term obligations, including those related to Contour.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 20 and, therefore, denies those allegations.**

21.     Following NAES's acquisition of Gridforce, all invoices issued to Gridforce by Contour were paid by NAES.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 21 and, therefore, denies those allegations.**

22.     All discussions and inquiries concerning such invoices were between Contour and NAES's Accounts Payable Department, not with Gridforce.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 22 and, therefore, denies those allegations.**

23.     Following NAES's acquisition of Gridforce, NAES migrated Gridforce's Microsoft Exchange Email to NAES's Office 365 Tenant.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 23 and, therefore, denies those allegations.**

24.     Upon information and belief, despite being identified as "Gridforce employees" following NAES's acquisition of Gridforce, Gridforce employees were and are, for all intents and purposes, managed, paid, and controlled by NAES and were and are consequently NAES employees/agents.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 24 and, therefore, denies those allegations.**

### CDW

25.     Upon information and belief, CDW is a worldwide technology company that sells hardware, software, and technology solutions to businesses of all sizes.

**ANSWER: CDW admits that it sells hardware, software, and technology solutions in the United States, Canada, the United Kingdom and other countries.  CDW denies the remaining allegations contained in Paragraph No. 25.**

26.     Upon information and belief, for the twelve (12) months ending in June 2020, CDW ranked No. 191 on the Fortune 500.

**ANSWER: CDW admits the allegations contained in Paragraph No. 26.**

27.     Upon information and belief, NAES has been a longtime customer of CDW.

**ANSWER: CDW admits that it previously has done business with NAES.  CDW denies the remaining allegations contained in Paragraph No. 27.**

28.    Upon information and belief, change orders and statements of work issued to NAES for the "lift and shift" described *infra* were issued by CDW Direct, LLC.

**ANSWER: CDW admits that change orders and statements of work were issued by CDW Direct LLC to NAES.  CDW denies all remaining allegations contained in Paragraph No. 28.**

### DOE DEFENDANTS

29.    Upon information and belief, the Doe Defendants are individuals that enjoy a working relationship with Gridforce and have obtained or used the Confidential Information and Trade Secrets described herein from Gridforce during the course of that working relationship.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 29 and, therefore, denies those allegations.**

### ABC DEFENDANTS

30.    Upon information and belief, the ABC Defendants are legal entities that enjoy a working relationship with Gridforce and have obtained or used the Confidential Information and Trade Secrets described herein from Gridforce during the course of that working relationship.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 30 and, therefore, denies those allegations.**

### CONTOUR'S CONFIDENTIAL INFORMATION AND TRADE SECRETS

31.    In 2013, James Thompson, then-President of Gridforce, approached Contour, seeking to enlist Contour's services in building an entirely original IT system, from the ground-up, for Gridforce – essentially, an IT network and system to permit Gridforce to operate its business as a utility company whilst satisfying regulatory requirements.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 31 and, therefore, denies those allegations.**

32.     At the time of Contour's engagement, Gridforce had absolutely <u>no</u> IT system or infrastructure; Gridforce retained Contour to create an entire IT system from and by which Gridforce would run its business.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 32 and, therefore, denies those allegations.**

33.     As the energy industry is one of the most tightly and closely regulated industries in the world, the technical, security, accessibility, reliability, and various other requirements provided by Gridforce to Contour concerning what the IT system to be authored/created by Contour must be able to do (and not fail to do) were extensive and complicated.

**ANSWER: CDW admits the energy industry is closely regulated.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 33 and, therefore, denies those allegations.**

34.     Confident in its abilities and the skill and expertise of its highly-trained and specialized technicians and engineers, Contour entered into a Managed Master Services Agreement (the "MMSA") with Gridforce on June 27, 2014. (<u>Exhibit A</u>.)

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 34 and, therefore, denies those allegations.**

35.     Over the course of a year and thousands of man-hours, Contour's experts designed, created, and authored an entirely original IT system to meet each of Gridforce's requirements.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 35 and, therefore, denies those allegations.**

36.     Creating an original IT system like the one required by Gridforce was not a simple, one-size-fits-all endeavor, particularly because Gridforce did not supply Contour with <u>any</u> templates for the construction of the IT system, and provided only one Excel spreadsheet identifying Gridforce employees by name and job title, as well as only one USB containing Gridforce-specific data and information that Gridforce wanted allocated to each employee.

**ANSWER: Upon information and belief, CDW admits that creating an IT system sufficient to meet Gridforce's requirements was not a one-size-fits-all endeavor.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 36 and, therefore, denies those allegations.**

37.     Contour therefore had to purchase all software, licenses, and hardware, and use its expertise and proprietary techniques to create a unique and entirely original IT configuration specifically suited to address each of Gridforce's specifications.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 37 and, therefore, denies those allegations.**

38.     Specifically, using its specialized and proprietary techniques, Contour designed, built, and configured multiple original, complex, and very sophisticated IT networks and firewalls, an extensive structure of interfacing servers and databases – including but not limited to the creation of all user accounts and groups, firewall rules, home directories, and folder mapping – a fault tolerant disaster recovery platform, and all backup technologies.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 38 and, therefore, denies those allegations.**

39.     The creation of Gridforce's IT system required Contour to author tens of thousands of lines of copyrightable/copyrighted computer source code, scripts, and rules. This material was

entirely original – created only by Contour for use only by Gridforce – and unique, and was the heart of the Gridforce system. Without this copyrightable/copyrighted Contour work product, the software, licenses, and hardware Contour purchased for use in the Gridforce system were virtually useless; it was only through Contour's authorship and implementation of its proprietary designs and techniques that the Gridforce system was brought to life (the techniques used, original system designed and created, and copyrightable/copyrighted material authored collectively referred to herein as Contour's "Confidential Information and Trade Secrets").[1]

**ANSWER:** **CDW denies the allegations contained in Paragraph No. 39.  CDW also lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Footnote 1 that a company other than Contour may have assembled an IT system for Gridforce that was different than the one Contour assembled.  CDW denies all remaining allegations contained in Footnote 1.  CDW also denies that the broad and undefined aspects of an IT system set forth in Exhibit B to the Complaint constitute legally protectible trade secrets.**

40.     The production environment for Contour's Confidential Information and Trade Secrets, i.e., the setting where Contour's Confidential Information and Trade Secrets were actually put into operation for use by Gridforce, was Reading, Pennsylvania.[2]

---

[1]   In the simplest terms, the software , e.g., Windows, etc., used in the Gridforce IT system (or any similar large-scale IT system) is only the smallest and most basic building block of the IT system. Without the original network design, mapping, source code, rules, and scripts (among other things) created and authored by Contour, the IT system has no idea what it should (or should not) do, has no security, has no ability to communicate with connected computers, and is essentially rendered useless. Another company may have looked at Gridforce's original IT system requirements and designed an altogether different IT system than that created by Contour, writing different source code, scripts, and rules. For that reason, the techniques used, original IT system designed and created, and copyrightable/copyrighted material authored by Contour is proprietary, confidential, and copyrightable/copyrighted material and trade secrets. A list identifying Contour's Confidential Information and Trade Secrets is attached hereto as Exhibit B.

[2]   All of the Confidential Information and Trade Secrets in the Contour-created Gridforce IT system resided in Reading as a "hot copy" of the Confidential Information and Trade Secrets master set that lived in Salt Lake City, Utah, i.e., a live version of the IT system that was continually checked, updated, etc. In August 2019,

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 40 and its accompanying Footnote 2. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 40 and its accompanying Footnote 2 and, therefore, denies those allegations.**

41.     Because the work required of Contour was so extensive and the deployment of the system so intricate, Contour purposely negotiated the contract price and provisions of the MMSA to ensure that Contour would retain the rights to its Confidential Information and Trade Secrets and that Gridforce's use of the same would only be in accordance with and pursuant to the MMSA – including the fulfillment its obligation under the MMSA to pay monthly for its use of Contour's Confidential Information and Trade Secrets – and not after the MMSA expired or was terminated.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 41. CDW is not a party to, nor is it bound by, the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 41 and, therefore, denies those allegations.**

42.     In other words, the MMSA – specifically, Section 6(a) of the MMSA – explicitly states that Contour's Confidential Information and Trade Secrets are proprietary in nature and belong entirely to Contour, and that, upon conclusion of the parties' relationship, Gridforce retains only the data it supplied to Contour and was housed in the IT system. The MMSA specifically

---

Reading became the location of the master set after it was switched from Salt Lake City. Thus, during the life of the MMSA and at all relevant times, Gridforce continuously accessed and used Contour's Confidential Information and Trade Secrets while such Confidential Information and Trade Secrets resided in Reading, Pennsylvania.

requires that Gridforce must cease using and return all Contour Confidential Information and Trade Secrets upon expiration or termination of the MMSA. *(See* Section 6(a) of <u>Exhibit A</u>.)

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 42.  CDW is not a party to, nor is it bound by, the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 42 and, therefore, denies those allegations.**

## THE MMSA

43.     The MMSA is a "master" form of contract, meaning it permits the parties to contract for multiple services without having to renegotiate the terms and conditions set forth in the MMSA.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 43 and, therefore, denies those allegations.**

44.     To that end, the MMSA governs the entirety of the parties' agreement, while various other documents, referred to as Service Order Forms or "SOFs," were issued each time Gridforce requested an additional and new item of work stemming from the MMSA.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 44 and, therefore, denies those allegations.**

45.     Similarly, pursuant to the MMSA, a Billing Change Request was issued if any changes were made or requested by Gridforce that would impact either the terms of a particular SOF or the billing associated with a SOF.[3]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 45 and its accompanying Footnote 3 and, therefore, denies those allegations.**

46.     The Initial Term of the MMSA was 36 months, with 12-month automatic renewals unless terminated by either party. Additionally, as SOFs were issued at various points throughout the parties' relationship, the MMSA provides that the terms and conditions of the MMSA control unless and until the expiration or termination of the particular SOF, meaning that even if the parties agreed not to renew the MMSA, it would remain in full force and effect until the last of the SOFs expired or terminated. *(See* Section 3(a) of Exhibit A.)

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 46 and, therefore, denies those allegations.**

47.     The MMSA permits either party to terminate the MMSA upon material breach by the other party, provided that notice of material breach is provided and the allegedly breaching party is permitted 30 days to cure such breach.

---

[3]   For example, six separate Billing Change Requests were issued for one SOF, SOF #062014-007, the substance of which SOF is discussed in more detail in fn. 4, *infra*.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 47 and, therefore, denies those allegations.**

48.     Section 3(b)(i) states,

> Either party hereto may immediately terminate this Agreement, with written notice, prior to the end of the Term upon the breach of any material provision of this Agreement by the other party, which breach shall have remained uncured for thirty (30) consecutive calendar days after written notice of such failure *shall* have been given to such party. (emphasis added).

(Section 3(b)(i) of <u>Exhibit A</u>.)

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 48 and, therefore, denies those allegations.**

49.     Section 3(b)(iii) also permits Gridforce to "immediately" terminate the agreement with 30 days prior written notice in the event that Gridforce "identif[ies] any governmental rule or regulation applicable to [Gridforce] or its customers that would be violated by this agreement or the [SOFs] and which cannot be prevented or mitigated by Contour." *(See* Section 3(b)(iii) of Exhibit A.)

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or**

information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 49 and, therefore, denies those allegations.

50.     "Confidential Information" is defined in Section 7(b) as, *inter alia,*

any proprietary or confidential information whether in verbal, written or some other tangible medium, including but not limited to . . . technical data, trade secrets, know-how, assets, operations, finances, technologies. . . processes, apparatus, equipment, algorithms, formulae, software, research, experimental work, products, [and] service plans.

(Section 7(b) of Exhibit A.)

**ANSWER:** CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 50 and, therefore, denies those allegations.

51.     Upon such expiration or termination by either party, Section 3(c) requires each party to deliver to the other party all Confidential Information owned by the other party, and "certify in writing to the other party within one week after the expiration or termination of [the MMSA] that it [did so]."[4] *(See* Section 3(c) of Exhibit A.)

**ANSWER:** CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 51 or its accompanying Footnote 4.  CDW is not a party to, nor is it bound by, the terms of the MMSA.

---

[4]   Contour's "Confidential Information" defined in Section 7(b) and protected in Section 6(a) is the same as the Confidential Information and Trade Secrets identified in ¶ 33, *supra*.

**Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 51 and its accompanying Footnote 4 and, therefore, denies those allegations.**

52.     Section 6(a) of the MMSA, entitled, "Ownership," was negotiated by Contour to protect Contour's rights to the original and valuable Confidential Information and Trade Secrets provided by Contour to Gridforce, and was specifically agreed to by Gridforce. Unambiguously, Section 6(a) states,

> Notwithstanding anything in this Agreement or any Exhibits to the contrary, Contour shall retain all exclusive right, title and interest to its software, technologies processes, systems, platforms, techniques, materials, equipment, templates, programs, know-how or other materials that are owned by or licensed to Contour including, but not limited to, any modifications or enhancements made to the foregoing while providing the Services hereunder, except for [that owned by Gridforce] as described in subsection (b) below[,]

*i.e.,* Contour's Confidential Information and Trade Secrets. *(See* Section 6(a) of Exhibit A.)

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 52.  CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to**

form a belief as to the truth of all remaining allegations contained in Paragraph No. 52 and, therefore, denies those allegations.

53.     While Section 6(a) gives Contour ownership of its Confidential Information and Trade Secrets, Section 6(b) gives Gridforce ownership of the Gridforce data therein, i.e., employee-specific data, information related to Gridforce's business, etc. *(See* Section 6(b) of Exhibit A.)

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 53. CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 53 and, therefore, denies those allegations.**

54.     Though the MMSA was signed on June 27, 2014, the parties did not settle on final financial terms until July 22, 2014. (Exhibit C.) During the negotiations, Gridforce informed Contour that, although it did not have much capital to cover Contour's upfront costs associated with building the Gridforce IT system – including equipment, license, and simple manpower costs – it was able to pay a significant ongoing monthly fee for Contour's design, construction, maintenance, support, and management of the Gridforce IT system and for Gridforce's use of the same during the term of the MMSA.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 54 and, therefore, denies those allegations.**

55.     As such, Contour agreed to an upfront fee of $128,775, as well as a payment of $79,804.27 per month for five years, in addition to the provisions set forth in Section 6(a) providing ownership to Contour of everything Contour created. (See Exhibit C.) Contour regarded its retention of its Confidential Information and Trade Secrets (Section 6(a)) as the most critical provision of the MMSA.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 55.  Answering further, CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 55 and, therefore, denies those allegations.**

56.     Over the course of the first year of the agreement, the parties agreed to an increased monthly fee payable to Contour of $100,999.38 and created a new 60-month term. The parties' assent to the MMSA's new monthly fee and new 60-month term were memorialized in SOF #062014-007 ("SOF007"), signed on August 11, 2015; instead of expiring in June 2019, the MMSA would now not expire until August 11, 2020. *(See* Exhibit D.)

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA, or any of its related documents.  Accordingly, other than the words of the SOF attached as Exhibit D to the Complaint, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 56 and, therefore, denies those allegations.**

57.     It is no exaggeration to describe what Gridforce provided to Contour at the inception of the parties' relationship as a completely blank slate and mere list of system

requirements – no equipment, processes, techniques, licenses, or technology was given. Rather, each and every block of the Gridforce IT system was designed, created, authored, and built solely and originally by Contour, all of which, per Section 6(a) of the MMSA, would and does belong to Contour as Contour's Confidential Information and Trade Secrets, and which could only be used by Gridforce during the term of the MMSA and if Gridforce paid the fees/invoices required by the MMSA for such use.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 57. Answering further, CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 57 and, therefore, denies those allegations.**

58.     The MMSA is governed by the laws of Maryland. *(See* Section 12(i) of <u>Exhibit A</u>.)

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 58 and, therefore, denies those allegations.**

## 2016 CORRESPONDENCE

59.     The first few years of the parties' relationship were largely successful, and Gridforce repeatedly praised Contour for the system Contour created and the services (and the use of the IT system) it continued to provide.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 59 and, therefore, denies those allegations.**

60.     On September 22, 2016, however, then-Managing Director (now President) of Gridforce, C.J. Ingersoll, Esq., sent a letter to Rocco Guerriero, President and CEO of Contour, identifying what Gridforce claimed were "material breaches" of the MMSA by Contour ("2016 Breach Letter").[5]

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 60 and its accompanying Footnote 5 and, therefore, denies those allegations.**

61.     Specifically, Gridforce alleged that Contour failed to implement a compliant National Energy Regulatory Commission ("NERC") Critical Infrastructure Protection Reliability Standards ("CIP") program by the required deadline of July 1, 2016. Gridforce demanded "immediate corrective action by Contour and the implementation of a compliant NERC CIP program," and reserved its right to terminate the MMSA, citing Section 3(b)(iii) *(see supra* ¶ 43) as authority for such purported right to terminate.[6]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 61 and its accompanying Footnote 6 and, therefore, denies those allegations.**

---

[5]   The 2016 Breach Letter may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

[6]   Though Gridforce cited to Section 3(b)(iii) of the MMSA in both its September 22, 2016 and February 7, 2020 (discussed infra) letters to Contour, Contour disagrees that Section 3(b)(iii) is applicable to these issues: even if Gridforce had a noncompliant CIP program, NERC's regulations apply to Gridforce, not Contour; Contour was not subject to NERC's authority as an IT company, and could only perform the actions requested of it by Gridforce. Therefore, if Gridforce's program was noncompliant, it was the result of Gridforce's failures to provide proper instruction and guidance to Contour as to what was needed.

62.     Contour responded to Gridforce's September 22, 2016 letter on October 4, 2016 ("2016 Response"), responding to each and every one of Gridforce's allegations in detail, and noting its total disagreement with Gridforce's purported right to terminate, as well as each of Gridforce's allegations.[7]

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 62 and its accompanying Footnote 7 and, therefore, denies those allegations.**

63.     Among other things, Contour noted that, contrary to Gridforce's identification, Section 3(b)(iii) of the MMSA was inapplicable to any alleged breaches by Contour, as Gridforce had not identified any way in which the MMSA itself violated a governmental rule or regulation.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 63 and, therefore, denies those allegations.**

64.     Contour additionally reminded Gridforce that CIP compliance was not Contour's responsibility, but rather Gridforce's; Contour could only perform the tasks requested of it by Gridforce. Therefore, if Gridforce did not have a compliant CIP program, such noncompliance was the result of Gridforce's failure to inform Contour of the CIP requirements and collaborate concerning the same.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 64 and, therefore, denies those allegations.**

---

[7]  The 2016 Response may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

65.     Following Contour's 2016 Response, Gridforce did not raise any issues related to CIP compliance until February 2020, and Contour thus considered the issues raised in the September 2016 Letter closed, satisfied, and/or cured.

**ANSWER:** **CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 65 and, therefore, denies those allegations.**

66.     NAES purchased Gridforce in July 2017.

**ANSWER:** **CDW admits that NAES acquired Gridforce.   CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 66, including the timing and manner of the acquisition, and, therefore, denies those allegations.**

## THE "LIFT AND SHIFT" OF THE CONTOUR-CREATED IT SYSTEM

67.     In/around the spring of 2019, Gridforce and NAES determined – unbeknownst to Contour – that Gridforce no longer wished to honor its commitments under the MMSA, and instead, Gridforce and NAES would undertake the theft of the Contour-created IT System and misappropriation of Contour's Confidential Information and Trade Secrets.

**ANSWER:** **CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 67.   CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 67 and, therefore, denies those allegations.**

68.     In connection therewith, NAES hired Kristin Nelson as a Senior Project Manager to oversee what Gridforce and NAES then described as a large "data migration" project. In reality, Gridforce and NAES were planning to steal the Contour-created IT System, and "lift and shift" it from servers owned and operated by Contour to those owned and controlled by Gridforce. Gridforce and NAES intentionally concealed this scheme from Contour.

**ANSWER: CDW admits that, at some point, Kristin Nelson became a project manager at Gridforce and was involved with the Gridforce data migration project.  CDW denies all remaining allegations contained in Paragraph No. 68.**

69.     Despite being labeled as a "Gridforce employee," Ms. Nelson was contacted by a NAES recruiter when she applied for her position, her salary was paid by NAES, and her employment offer and letter came from NAES.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 69 and, therefore, denies those allegations.**

70.     Ms. Nelson was hired by NAES to perform the "lift and shift," i.e., theft, of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW admits that Kristin Nelson was involved in the data migration project. CDW denies all remaining allegations contained in Paragraph No. 70.**

71.     Ms. Nelson and other individuals, including Gridforce employee Keith Kerr and NAES employee Edward Angus, working on the "lift and shift" were ordered to keep the "project," i.e., theft, secret from Contour, as Contour would "shut the project down" if it was made aware.

**ANSWER: CDW admits that, in addition to Ms. Nelson, Keith Kerr and Edward Angus were involved in the data migration project.  CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 71 and, therefore, denies those allegations.**

72.     After Ms. Nelson's hire, and upon realization that the work involved in the "lift and shift" was extensive, NAES retained the services of CDW[8] to assist in the project.

**ANSWER:  CDW admits that CDW was hired to assemble a new IT system for Gridforce and to migrate Gridforce's data to that system.  CDW also admits that change orders were issued by CDW Direct, LLC and that Contour's Complaint is directed to both CDW entities. CDW denies all remaining allegations contained in Paragraph No. 72 and its accompanying Footnote 8.**

73.     CDW was hired by NAES to perform the "lift and shift," i.e., theft, of the Contour-created IT System and Contour's Confidential Information and Trade Secrets. CDW employee Michael Peters - also known as CDW's "Chief Migrator" -was intimately involved in the migration of the Contour-created IT System and Contour's Confidential Information and Trade Secrets. Mr. Peters, from CDW's offices in Texas, used his computer to access Contour's protected computer systems based in Utah and Pennsylvania at the direction of Gridforce and NAES. Mr. Peters was provided a username and password by Gridforce and NAES to access Contour's protected computer systems and servers. Upon gaining unauthorized access, Mr. Peters proceeded to "lift and shift" the Contour-created IT System and Contour's Confidential Information and Trade Secrets without Contour's knowledge or consent.

**ANSWER:  CDW admits that it was hired to assist in the data migration for Gridforce. CDW further admits that Michael Peters was involved in the data migration CDW performed for Gridforce and that Mr. Peters performed work related to such data migration while Mr. Peters was physically located in Texas.  CDW also admits that Mr. Peters was**

---

[8]  Upon information and belief, CDW Corporation was the entity hired by NAES to perform the "lift and shift," but change orders and statements of work were issued to NAES by CDW Direct, LLC. "CDW" is used herein to refer to both entities.

provided a username and password by Gridforce to access the Gridforce data that CDW migrated.  CDW denies the all remaining allegations contained in Paragraph No. 73.

74.     Upon information and belief, NAES paid each invoice CDW submitted to Gridforce and/or NAES in connection with CDW's work on the "lift and shift."

**ANSWER: CDW admits that NAES paid the CDW invoices submitted in connection with the Gridforce data migration project.  CDW denies all remaining allegations contained in Paragraph No. 74.**

75.     Upon information and belief, CDW has worked extensively for NAES in the past.

**ANSWER: CDW admits that NAES has been a CDW customer in the past.  CDW denies all remaining allegations contained in Paragraph No 75.**

76.     CDW was also told by Gridforce and/or NAES not to disclose any details of the "lift and shift" to Contour. Despite having knowledge that Contour owned the computer systems and servers CDW breached, CDW made no effort to get Contour's authorization before proceeding with the "lift and shift."

**ANSWER:  CDW denies the allegations contained in Paragraph No. 76.**

77.     Despite CDW's obvious sophistication as a technology company, and the fact that concealing the "lift and shift" from the creator and owner of the system – Contour – was well outside the norm of data migration procedure, CDW acquiesced and proceeded in line with Gridforce and/or NAES's request.

**ANSWER: CDW denies the allegations contained in Paragraph No. 77.**

78.     CDW was given full access, including a username and password, by Gridforce and/or NAES to the Contour-created IT System and Contour's Confidential Information and Trade Secrets during the course of CDW's work in connection with the "lift and shift;" at (at least) one

point during the project, CDW had the entirety of the Contour-created IT System in its possession and on its servers. Upon information and belief, CDW still maintains a copy of the entirety of the Contour-created IT System in its possession.

**ANSWER:  CDW admits that Michael Peters was provided a username and password by Gridforce to access the Gridforce data that CDW migrated.  CDW denies the remaining allegations contained in Paragraph No. 78.**

79.     Upon accessing the Contour-created IT System, the user was met with a disclaimer identifying the System as the property of Contour and prohibiting all unauthorized use.

**ANSWER: CDW admits that certain elements of Gridforce's former IT system included a statement that notified unauthorized users that the "system" was the property of Contour. CDW denies all remaining allegations contained in allegations contained in Paragraph No. 79.**

80.     Gridforce, NAES, and CDW would have seen this disclaimer each time they accessed the system. Despite having knowledge of the disclaimer, CDW disregarded it and proceeded with the unauthorized "lift and shift." CDW never contacted Contour to get its consent prior to commencing the unauthorized "lift and shift."

**ANSWER:  CDW admits that certain elements of the legacy Gridforce IT system contained the alleged statement.  CDW denies that its employee conducting the data migration saw any such statement in the limited portions of the Gridforce system that were accessed in order to perform the migration.  CDW lacks knowledge of information sufficient to form a belief as to the truth of the remaining allegations contained in the first sentence of Paragraph 80, and, therefore denies those allegations.  CDW denies the allegations contained in the second**

**sentence of this Paragraph 80.  CDW admits that it had no contact with Contour.  CDW denies the remaining allegations contained in the third sentence of Paragraph 80.**

81.     Ms. Nelson and others at Gridforce and/or NAES were aware that the Contour-created IT System belonged to and was owned by Contour.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 81 and, therefore, denies those allegations.**

82.     Ms. Nelson raised several concerns to her superiors at Gridforce concerning the ethics and legality of the "lift and shift," including C.J. Ingersoll and Denise Ayers, but Ms. Nelson was rebuffed and ordered to simply do her job.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 82 and, therefore, denies those allegations.**

83.     In/around November 2019, Contour became suspicious of Gridforce's actions, and as a result, Gridforce and/or NAES and CDW were forced to "maneuver around" Contour's roadblocks. CDW thus knowingly and actively participated in the concealment of the theft of the Contour-created IT System.

**ANSWER: CDW denies the allegations contained in Paragraph No. 83.**

84.     At the conclusion of CDW's involvement in the "lift and shift" in/around the fall of 2019, Ms. Nelson was ordered by C.J. Ingersoll to require CDW to "destroy ALL evidence" of the project that CDW had in its possession[9].

---

[9] Contour issued a subpoena to CDW on September 15, 2020. Dkt. No. 34. CDW produced only a handful of documents in response to the subpoena before Gridforce filed its Motion for Protective Order Regarding CDW Discovery (Dkt. No. 54), threatened CDW with a breach of contract action if CDW further complied with the subpoena, and halted all production of documents and witnesses by CDW.

**ANSWER: CDW admits that Gridforce requested that, for security reasons, CDW not retain as-built drawings and other information related to the specifics of the Gridforce IT system assembled by CDW.  With regard to Footnote 9 accompanying Paragraph 84, CDW admits that Contour issued a subpoena to CDW on September 15, 2020.  CDW further admits that Gridforce requested CDW abide by certain terms of CDW's contract with Gridforce prior to producing documents in response to the subpoena.  Prior to Contour filing its First Amended Verified Complaint, CDW produced more than 8,600 documents in response to Contour's subpoena.  CDW denies all remaining allegations contained in Paragraph 84 and its accompanying Footnote 9.**

### MMSA 2019 AUTO-RENEWAL

85.     Following Gridforce's baseless accusations concerning alleged noncompliance by Contour – accusations which Gridforce never pursued or raised again until February 2020 – Gridforce and Contour continued their working relationship, and Gridforce requested the issuance of at least 11 additional SOFs throughout the following years, representing new work performed by Contour for Gridforce.[10]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 85 and its accompanying Footnote 10 and, therefore, denies those allegations.**

86.     Additionally, in September 2019, Gridforce agreed to an automatic 36-month extension of the MMSA by requesting multiple Billing Change Requests related to SOF #007.

---

[10]  The SOFs may contain confidential of Gridforce and/or a third party, and as such, will not be attached as exhibits to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

(Exhibit E; *see also* Exhibit D.) This auto-renewal was the result of the issuance of additional licenses and work performed by Contour at Gridforce's request relating to Gridforce's data center.[11]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 86 and its accompanying Footnote 11 and, therefore, denies those allegations.**

87.     Because these types of modifications to the Gridforce licenses and data center – which were demanded by Gridforce – necessarily required Contour to enter into extended agreements with its own vendors and suppliers in order to perform the requested work (meaning changes were made to Gridforce's monthly billing), the MMSA and language in the applicable SOF provided for the automatic extension. Essentially, had the SOF not provided for an automatic extension of the MMSA to match the new obligations Contour was required to undertake, Contour would have entered into agreements and licenses with its own vendors and suppliers in order to satisfy Gridforce's requests, and would have been both contractually and financially obligated to honor those agreements and licenses after the original term of the MMSA expired.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 87 and, therefore, denies those allegations.**

---

[11]   As described in ¶ 63, *infra*, the auto-renewal was not based on how much additional cost was added to Gridforce's monthly bill, but on the impact of the Gridforce's requested changes, in that the additional requested licenses and data center changes triggered other obligations and requirements on Contour's part.

88.     In addition to Gridforce representatives, specifically but not limited to Denise Ayers, Vice President of Finance, explicitly informing Contour that Gridforce agreed to the renewal of the MMSA, Gridforce also agreed to a suggested large-scale server implementation project in October 2019.[12] These overt actions in September and October 2019 evidence that, contrary to Gridforce's current assertions, the parties' working relationship was in no way troubled and that Gridforce had not expressed any dissatisfaction with Contour's work product after September 2016.

**ANSWER:** **CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 88 and, therefore, denies those allegations.**

## GRIDFORCE'S NON-RENEWAL AND TERMINATION LETTERS

89.     On December 23, 2019, Ms. Ingersoll wrote to Mr. Guerriero, and informed him that, under Section 3(a) of the MMSA, Gridforce did not intend to renew the MMSA and that the MMSA would consequently terminate on June 27, 2020 (the "Notice of Non-Renewal").[13]

**ANSWER:** **CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 89 and its accompanying Footnote 13 and, therefore, denies those allegations.**

---

[12]   To place the size of the server project into perspective, in preparation for the project's implementation, Contour allocated over $250,000 worth of equipment necessary to upgrade the servers. This work also stemmed from SOF #007, but Contour was not able to issue a Billing Change Request for the project prior to the inception of the parties' current dispute.

[13]   The Notice of Non-Renewal may contain confidential of one or both parties and as such , will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

90.     The purpose of Ms. Ingersoll's letter was not to terminate the MMSA, but rather, in Gridforce's mind, to decline its renewal/extension; the MMSA remained in full force and effect.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 90 and, therefore, denies those allegations.**

91.     As Ms. Ingersoll and Gridforce well knew, however, the MMSA was not due to expire on June 27, 2020, but rather on August 11, 2023, according to SOF #007 and the extension agreed to by Gridforce in 2015 *(see supra* ¶ 50), as well as the renewal agreed to by Gridforce in September 2019 *(see supra* ¶¶ 62-63).

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 91 and, therefore, denies those allegations.**

92.     During January 2020, the parties engaged in various discussions concerning Gridforce's return of equipment related to the server upgrade; Gridforce had retained both the old and new server equipment, and was stonewalling Contour's attempts to retrieve whatever equipment Gridforce would no longer require.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 92 and, therefore, denies those allegations.**

93.     During these discussions, Contour also reminded Gridforce that the MMSA was in renewal until August 2023 based on the terms of the agreement and Gridforce's acquiescence to both those terms and the renewal itself, and therefore would not expire until that time.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 93 and, therefore, denies those allegations.**

94.     Though Gridforce had the right as a customer not to renew the MMSA, it remained under a legal obligation to pay its outstanding invoices (plus interest at a rate of 1.5% per month), as well as the monthly fees due for the remainder of the term of the MMSA.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves,  CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 94 and, therefore, denies those allegations.**

95.     Accordingly, immediately following receipt of the Notice of Non-Renewal, Mr. Guerriero and Gridforce's representative, Alan Bull (General Manager for Energy Compliance at NAES) began to discuss the wind-down of the parties' relationship, the return of and assurance that Gridforce would cease using Contour's Confidential Information and Trade Secrets, and the payment of outstanding invoices due from Gridforce to Contour (plus interest), then-totaling $406,676.26.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 95.  CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 95 and, therefore, denies those allegations.**

96.     Mr. Guerriero provided Mr. Bull with extensive information concerning these issues during email exchanges and conversations in January 2020.[14]

**ANSWER:** CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 96 and its accompanying Footnote 14 and, therefore, denies those allegations.

97.     On February 7, 2020, Gridforce provided Contour with a Notice of Termination for Default ("Termination Letter").[15]

**ANSWER:** CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 97 and its accompanying Footnote 15 and, therefore, denies those allegations.

98.     The Termination Letter referred back to Gridforce's 2016 Breach Letter – which Gridforce had not raised at any time in the ensuing 3.5 years – and alleged that Contour had committed material breaches of the MMSA by, in essence, failing to maintain an adequate IT network.

**ANSWER:** CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 98 and, therefore, denies those allegations.

---

[14]  Mr. Guerriero engaged outside counsel in late January 2020, who began discussions with NAES representatives at that time on Contour's behalf. NAES also involved its Associate General Counsel, David Miner, in the discussions around this time.

[15]  The Termination Letter may contain confidential of one or both parties and as such, will not be attached as an exhibit to this Verified Complaint. However, copies can and will be provided to the Court upon the entrance of an appropriate protective order in this matter.

99.     Citing Section 3(b)(iii) of the MMSA, Gridforce also alleged that it was subject to an enforcement action by the NERC as a result of a noncompliant CIP program and Contour's breaches, and that the alleged enforcement action was a "separate ground for termination" of the MMSA.[16]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 99 and its accompanying Footnote 16 and, therefore, denies those allegations.**

100.    Gridforce stated in its Termination Letter that it was therefore exercising its right to <u>immediately</u> terminate the MMSA.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 100 and, therefore, denies those allegations.**

101.    Assuming that the allegations against Contour in Gridforce's Termination Letter are true – which they are not – the statements therein mean that Contour had purportedly been in material breach of the MMSA for 3.5 years. However, Gridforce never sought to terminate the MMSA in those 3.5 years, and even as recently as less than 45 days before the Termination Letter, had only issued a Notice of Non-Renewal; if Contour's actions were so egregious, it is unclear why Gridforce did not terminate the MMSA sooner.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or**

---

[16]    Again, since September 2016, Gridforce had not raised any issues related to CIP compliance with Contour, and did not provide any further details in its Termination Letter concerning any purported "enforcement action."

information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 101 and, therefore, denies those allegations.

102.     Regardless, these statements concerning CIP noncompliance and the purported NERC enforcement action – and Gridforce's attempts to refer back to its September 2016 Breach Letter – do not provide any valid basis for terminating the MMSA. Not only do NERC's standards not apply to Contour (as discussed in fn. 6, supra), Gridforce was silent concerning any purported noncompliance by Contour for over three years, demonstrating that either (1) Gridforce wholly accepted Contour's 2016 Response and total denial that Contour ever breached the MMSA and/or (2) Contour fully cured the issues Gridforce raised in its 2016 Breach Letter.[17]

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 102 and its accompanying Footnote 17 and, therefore, denies those allegations.**

103.     As explained to Mr. Bull by Mr. Guerriero in January 2020 and later by Contour's outside counsel, it was – and actually is – Contour, not Gridforce, that has incurred significant damages and harm as a result of Gridforce's material breaches of the MMSA, including but not limited to Gridforce's failure to pay invoices currently and past due, the continued unauthorized use and unlawful retention and disclosure of Contour's Confidential Information and Trade Secrets, and loss of future amounts owed to Contour under the renewal provisions of the MMSA.

---

[17] Contour reasserts its denial that it ever breached the MMSA, either in 2016 or at any point during the parties' relationship.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 103.  Answering further, CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 103 and, therefore, denies those allegations.**

104.     Moreover, Contour learned in/around October 2020 that during the execution of the "lift and shift," i.e., theft, of the Contour-created IT System, Gridforce and/or NAES and CDW destroyed approximately 15% of that System and Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 104.**

105.     Mr. Bull repeatedly acknowledged that Gridforce was in arrears to Contour and that Contour is entitled to not only payment for the outstanding invoices (plus interest), but also lost profits, expenses incurred by Contour (including license fees, etc.), and costs of collection. However, NAES has refused to fully compensate Contour.[18]

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 105 and its accompanying Footnote 18 and, therefore, denies those allegations.**

106.     NAES has also refused to provide requested information confirming that Gridforce has ceased using – and has not used since February 7, 2020 – Contour's Confidential Information

---

[18]   Apart from Ms. Ingersoll's Termination Letter, all communications pertaining to the Contour-Gridforce relationship beginning in January 2020 were between Contour and NAES; Gridforce did not participate in these discussions. Though Contour had always suspected that, for all intents and purposes, NAES controlled Gridforce, it was clear to Contour during the February – June 2020 discussions between Contour and NAES that NAES – not Gridforce – possessed the authority to resolve the dispute between Contour and Gridforce.

and Trade Secrets and/or that Gridforce has not disclosed Contour's Confidential Information and Trade Secrets to any third party.[19]

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 106. CDW further denies the allegations in Footnote 19. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 106 and, therefore, denies those allegations.**

107.    For example, Contour has repeatedly requested that Gridforce provide the log files for the Gridforce system, which are essentially a constant journaling of any changes made to the system; a review of the log files would confirm whether Gridforce misappropriated and altered Contour's Confidential Information and Trade Secrets for use in its new system, disclosed the same to third parties, and/or continues to use Contour's Confidential Information and Trade Secrets in its new system.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 107. CDW admits that log files can contain information regarding certain activity on an IT system. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 107 and, therefore, denies those allegations.**

108.    To be clear, the log files Contour requested would definitively show if Gridforce is complying with its obligations under the MMSA and state and federal trade secrets law, but Gridforce has refused to provide them to Contour.

---

[19]   To the contrary, Gridforce acknowledged that it did, in fact, disclose Contour's Confidential Information and Trade Secrets to CDW, Gridforce's new IT vendor.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 108. Answering further, CDW is not a party to, nor is it bound by, the terms of the MMSA. Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 108 and, therefore, denies those allegations.**

109.    Similarly, Contour also requested that NAES compare the IT system Contour created for Gridforce with the new Gridforce IT system purportedly created wholly by CDW.[20] Contour suggested that NAES either: (1) provide Contour with the new system for comparison; (2) provide a reputable and independent third party with the new system for comparison; or (3) that NAES conduct the comparison itself and provide the results to Contour. NAES has refused these requests. [21]

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 109 and its accompanying Footnotes 20 and 21. CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 109 and its accompanying Footnotes 20 and 21 and, therefore, denies those allegations.**

110.    In compliance with its own obligations under the MMSA, Contour has repeatedly requested that NAES provide a device to Contour so that Contour may securely return Gridforce's

---

[20]   An analysis of the two systems would reveal whether any of Contour's Confidential Information and Trade Secrets were used in the design and creation of the new system, or whether the Confidential Information and Trade Secrets are still being used in the operation of the new system.

[21]   Though NAES initially agreed to retain the log files and provide them to Contour, NAES then reversed course and inexplicably refused to do so. NAES's concealment of the log files and refusal to conduct a system comparison have prevented Contour from obtaining evidence crucial to its claims (and which could exonerate NAES on Contour's trade secret claims) and has therefore only lent further credence to Contour's allegations.

data – and Contour remains ready, willing, and able to do the same – but NAES appears oddly uninterested in the return of Gridforce's data, and has essentially ignored Contour's repeated requests to provide a device.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 110 and, therefore, denies those allegations.**

111.    During these discussions with NAES and pursuant to Section 12(b) of the MMSA, Contour also suggested that the parties attend mediation in an effort to resolve the parties' breach of contract dispute. While NAES agreed to do so in principle, they then failed to respond to Contour's proposals concerning a mediator or further cooperate concerning the mediation process, and thus, mediation between the parties appears futile.

**ANSWER: CDW is not a party to, nor is it bound by, the terms of the MMSA.  Accordingly, other than the words of the MMSA, which speak for themselves, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 111 and, therefore, denies those allegations**

112.    Four months after the Termination Letter, in June 2020, NAES informed Contour that Gridforce had been purportedly fined $4.8 million by the NERC as a result of Contour's alleged failures to maintain a compliant CIP program.

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 112 and, therefore, denies those allegations.**

113.    This was the first time Gridforce ever informed Contour that NERC had levied fines against Gridforce related to CIP compliance, despite constant email exchanges and telephone

discussions in the first six months of 2020 concerning monies owed to Contour and the return of Contour's Confidential Information and Trade Secrets. Contour remains unaware of when these purported fines were levied or their basis, but denies that it is in any way responsible for any fines levied against Gridforce by the NERC and/or that it failed to meet any CIP program specifications it was provided by Gridforce.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 113.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 113 and, therefore, denies those allegations.**

114.    The sum total of outstanding invoices due and payable to Contour by Gridforce through February 7, 2020 (the date of the Termination Letter) for services rendered, less payments made, plus continuing interest at a rate of 1.5% per month, is $8.384.04[22] (Exhibit F.)

**ANSWER: CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph No. 114 and its accompanying Footnote 22 and, therefore, denies those allegations.**

### COUNT I
### BREACH OF THE MMSA
### (GRIDFORCE)

115.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

---

[22] The $8,384.04 total identified here includes only those invoices for services rendered through the date of Gridforce's termination, less payments made by Gridforce subsequent to Contour's filing of the Verified Complaint.

Because the MMSA was not due to expire as of the date of Gridforce's improper termination (as set forth, supra), this figure does not include amounts for which Contour has continued to invoice Gridforce, and interest owing on those amounts.

**ANSWER: CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.  Paragraph No. 115 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 115 is required.  To the extent an answer is required, CDW denies said allegations.**

116.    Contour and Gridforce entered into the MMSA on June 27, 2014.

**ANSWER:  Paragraph No. 116 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 116 is required.  To the extent an answer is required, CDW denies said allegations.**

117.    Pursuant to Section 6(a) of the MMSA, Gridforce agreed that all Contour Confidential Information and Trade Secrets used to develop Gridforce's IT system was and would remain Contour property through the pendency of the MMSA and after its expiration or termination.

**ANSWER: Paragraph No. 117 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 117 is required.  To the extent an answer is required, CDW denies said allegations.**

118.    Gridforce also agreed, pursuant to Section 6(c) of the MMSA, that it would not "delete, alter, cover, or distort any copyright, trademark, or other proprietary rights notice placed by [Contour] on or in Contour materials and information or Technology and shall ensure that all such notices are reproduced on all copies thereof."

**ANSWER: Paragraph No. 118 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 118 is required.  To the extent an answer is required, CDW denies said allegations.**

119.     Gridforce also agreed: (1) pursuant to Sections 2 and 3(d), to pay Contour for services rendered; (2) pursuant to Section 3(c), to return and cease using all Contour Confidential Information and Trade Secrets to Contour at the expiration or termination of the MMSA; and (3) pursuant to Section 7(a), to not disclose Contour's Confidential Information and Trade Secrets to any third party and/or use Contour's Confidential Information and Trade Secrets for its own benefit or for the benefit of a third party, except as allowed for under the MMSA.

**ANSWER: Paragraph No. 119 is included in Count I, which does not contain a claim or allegation against CDW. Accordingly, no response to the allegations contained in Paragraph No. 119 is required.  To the extent an answer is required, CDW denies said allegations.**

120.     Despite these clear contractual obligations, Gridforce (1) improperly attempted to terminate the MMSA, (2) disclosed Contour's Confidential Information and Trade Secrets to one or more third parties, including but not limited to its new IT vendor, CDW, (3) has failed to pay invoices due and owing to Contour totaling hundreds of thousands of dollars, plus interest, (4) used Contour's Confidential Information and Trade Secrets in its new IT system and continues to use the Confidential Information and Trade Secrets of Contour today, (5) removed and/or deleted the disclaimer Contour placed on the Contour-created IT System identifying the System as Contour property and prohibiting unauthorized access, and (5) has failed to return Contour's Confidential Information and Trade Secrets, all in material breach of the MMSA and certain common law and statutory obligations as set forth herein below.

**ANSWER: Paragraph No. 120 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 120 is required.  To the extent an answer is required, CDW denies said allegations.**

121.     Gridforce's actions are a breach of, at least, Sections 2, 3(c) and (d), 6(a), 6(c), and 7(a) of the MMSA.

**ANSWER: Paragraph No. 121 is included in Count I, which does not contain a claim or allegation against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 121 is required.  To the extent an answer is required, CDW denies said allegations.**

122.     As a result of Gridforce's breaches of the MMSA, Contour has suffered and continues to suffer damages.

**ANSWER: Paragraph No. 122 is included in Count I, which does not contain a claim or allegation against CDW. Accordingly, no response to the allegations contained in Paragraph No. 122 is required.  To the extent an answer is required, CDW denies said allegations.**

**COUNT II**

**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF
Md. Code Ann. § 11-1201 _et seq_. and/or including but not limited to
12 Pa. C.S.A. § 5301 _et seq_., Tex, Civ. Prac. and Rem. Code § 134A _et seq_.,
Wash. Rev. Code § 19.108 _et seq_., and Del. C. § 2001 _et seq_.
(GRIDFORCE, NAES, CDW, DOE DEFENDANTS, AND ABC DEFENDANTS)**

123.     Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER: CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.**

124.     The techniques, strategies, and processes used to design and implement the IT system Contour created for Gridforce are proprietary to Contour and constitute legally protectable trade secrets as defined by the Maryland Uniform Trade Secrets Acts, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade

secrets laws of any other jurisdiction in which Gridforce has used or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 124 states legal conclusions, to which no answer is required.  To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 124.**

125.    The Confidential Information and Trade Secrets have actual or potential economic value because, both separately and in combination, that information is not generally known to, and is not readily ascertainably by proper means by others, including Contour's competitors.

**ANSWER: Paragraph No. 125 states legal conclusions, to which no answer is required.  To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 125.**

126.    Contour spent substantial sums of money and expended significant time and energy to develop and generate the Confidential Information and Trade Secrets and has taken steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

**ANSWER: Paragraph No. 126 contains a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 126.**

127.    Contour was at all times in lawful possession of the Confidential Information and Trade Secrets, and used them exclusively in its lawful business activities.

**ANSWER: Paragraph No. 127 contains a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 127.**

128.     Contour shared its Confidential Information and Trade Secrets with Gridforce pursuant to the MMSA and therefore in the course of its confidential relationship with Gridforce.

**ANSWER: Paragraph No. 128 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 128.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 128 and, therefore, denies those allegations.**

129.     Upon information and belief, Gridforce took Contour's Confidential Information and Trade Secrets and currently uses it in its current IT system, without Contour's permission or authorization.

**ANSWER: Paragraph No. 129 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 129.**

130.     Upon information and belief, NAES, without Contour's permission or authorization, accessed the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 130 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the remaining allegations contained in Paragraph No. 130.**

131.     Upon information and belief, CDW, without Contour's permission or authorization, accessed the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 131**

132.   Upon information and belief, NAES and CDW assisted Gridforce in its theft of Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 132.**

133.   Upon information and belief, Gridforce disclosed Contour's Confidential Information and Trade Secrets to NAES, CDW, Doe Defendants, ABC Defendants, and other third parties.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 133.  Answering further, CDW denies all remaining allegations contained in Paragraph No. 133 as they pertain to CDW.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 133, as they pertain to other parties, and, therefore, denies those allegations.**

134.   As described in the foregoing paragraphs, Gridforce, knowing that it had access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Gridforce has used or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 134 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 134.**

135.    As described in the foregoing paragraphs, NAES, knowing that it had unauthorized access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which NAES has accessed, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 135 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 135.**

136.    As described in the foregoing paragraphs, CDW, knowing that it had unauthorized access to Contour's Confidential Information and Trade Secrets and that the Confidential Information and Trade Secrets belonged to Contour, willfully misappropriated, retained, and used Contour's Confidential Information and Trade Secrets in violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which CDW has accessed, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 136.**

137.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by Gridforce constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

**ANSWER: Paragraph No. 137 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 137.**

138.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by NAES constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

**ANSWER: Paragraph No. 138 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 138.**

139.    The misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets by CDW constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Uniform Trade

Secrets Act, and the trade secrets laws of any other jurisdiction in which Contour's Confidential Information and Trade Secrets have been used or disclosed.

**ANSWER: CDW denies the allegations contained in Paragraph No. 139.**

140.    Gridforce's misappropriation of Contour's Confidential Information and Trade Secrets was undertaken willfully and maliciously.

**ANSWER: Paragraph No. 140 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 140.**

141.    NAES's misappropriation of Contour's Confidential Information and Trade Secrets was undertaken willfully and maliciously.

**ANSWER: Paragraph No. 141 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 141.**

142.    CDW's misappropriation of Contour's Confidential Information and Trade Secrets was undertaken willfully and maliciously.

**ANSWER: CDW denies the allegations contained in Paragraph No. 142.**

143.    Upon information and belief, NAES knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, NAES's misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act,

and the trade secrets laws of any other jurisdiction in which NAES has misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 143 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW the allegations contained in Paragraph No. 143.**

144.    Upon information and belief, CDW knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Doe Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 144.**

145.    Upon information and belief, Doe Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which Doe Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 145 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 145.**

146.    Upon information and belief, ABC Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Secrets. Accordingly, their misappropriation and wrongful use of Contour's Confidential Information and Trade Secrets constitutes a violation of the Maryland Uniform Trade Secrets Act, as well as, including but not limited to, the Pennsylvania Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the Washington Uniform Trade Secrets Act, the Delaware Trade Secrets Act, and the trade secrets laws of any other jurisdiction in which ABC Defendants have misappropriated, used, or disclosed Contour's Confidential Information and Trade Secrets.

**ANSWER:  Paragraph No. 146 contains a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations contained in Paragraph No. 146.**

147.    By virtue of the foregoing, Contour has suffered and will continue to suffer the loss of confidential business and proprietary information and trade secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 147.**

148.    As a direct and proximate result of Defendants' misappropriation of Contour's Confidential Information and Trade Secrets, Contour has suffered and continues to suffer monetary damages and irreparable harm.

**ANSWER: CDW denies the allegations contained in Paragraph No. 148.**

## COUNT III
### FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
### (GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)

149.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER: CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.  Paragraph No. 149 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 149 is required.  To the extent an answer is required, CDW denies said allegations.**

150.    Contour has offered for sale or sold its Confidential Information and Trade Secrets in interstate commerce.

**ANSWER: Paragraph No. 150 is included in Count III, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 150 is required.  To the extent an answer is required, CDW denies said allegations.**

151.    Contour's Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known or readily ascertainable through appropriate means by other persons who might obtain economic value from their disclosure or use.

**ANSWER: Paragraph No. 151 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 151 is required.  To the extent an answer is required, CDW denies said allegations.**

152.    Contour has made reasonable efforts under the circumstances to maintain the secrecy of its Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 152 is included in Count III, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 152 is required.  To the extent an answer is required, CDW denies said allegations.**

153.   Upon information and belief, Gridforce has misappropriated Contour's Confidential Information and Trade Secrets by retaining them without Contour's permission or authorization and disclosing them to third parties, including but not limited to NAES, Doe Defendants, and ABC Defendants, to Contour's detriment. Gridforce knew it did not have permission to disclose or otherwise use Contour's Confidential Information or Trade Secrets other than in Contour's interests. Gridforce's retention and disclosure were improper because, among other things, it was contractually required to cease using and return all Confidential Information and Trade Secrets to Contour upon termination or expiration of the MMSA.

**ANSWER: Paragraph No. 153 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 153 is required.  To the extent an answer is required, CDW denies said allegations.**

154.   Upon information and belief, NAES knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, NAES's use of the Confidential Information and Trade Secrets was an improper misappropriation.

**ANSWER: Paragraph No. 154 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 154 is required.  To the extent an answer is required, CDW denies said allegations.**

155.   Upon information and belief, CDW knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets.

Accordingly, CDW's use of the Confidential Information and Trade Secrets was an improper misappropriation.

**ANSWER: CDW denies the allegations contained in Paragraph No. 155.**

156.    Upon information and belief, Doe Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their use of the Confidential Information and Trade Secrets was an improper misappropriation.

**ANSWER: Paragraph No. 156 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 156 is required.  To the extent an answer is required, CDW denies said allegations.**

157.    Upon information and belief, ABC Defendants knew or should have known that Gridforce was under a duty not to retain or disclose Contour's Confidential Information and Trade Secrets. Accordingly, their use of the Confidential Information and Trade Secrets was an improper misappropriation.

**ANSWER: Paragraph No. 157 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 157 is required.  To the extent an answer is required, CDW denies said allegations.**

158.    Defendants' retention, use, and disclosure of Contour's Confidential Information and Trade Secrets has and will irreparably harm Contour, some of which harm cannot be adequately compensated by remedies at law. The public interest would not be disserved by an injunction.

**ANSWER: Paragraph No. 158 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 158 is required.  To the extent an answer is required, CDW denies said allegations.**

159.     To the extent Contour's harms may be compensated by legal remedies, Contour is entitled to recover damages from Defendants in an amount to be determined at law.

**ANSWER: Paragraph No. 159 is included in Count III, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 159 is required.  To the extent an answer is required, CDW denies said allegations.**

**COUNT IV**
**CONVERSION AND/OR NEGLIGENT DESTRUCTION OF PROPERTY**
**UNDER PENNSYLVANIA COMMON LAW**
**(GRIDFORCE, NAES ,CDW)**

160.     Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER: CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.**

161.     The Confidential Information and Trade Secrets have actual or potential economic value because, both separately and in combination, that information is not generally known to, and is not readily ascertainably by proper means by others, including Contour's competitors.

**ANSWER: CDW denies the allegations contained in Paragraph No. 161.**

162.     Contour spent substantial sums of money and expended significant time and energy to develop and generate the Confidential Information and Trade Secrets and has taken steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

**ANSWER: CDW denies the allegations contained in Paragraph No. 162.**

163.    Contour was at all times in lawful possession and the lawful owner of its Confidential Information and Trade Secrets, and used them exclusively in its lawful business activities.

**ANSWER: CDW denies the allegations contained in Paragraph No. 163.**

164.    During the course of the theft of the Contour-created IT System and Contour's Confidential Information and Trade Secrets, Gridforce, NAES, and/or CDW destroyed approximately 15% of the same.

**ANSWER: CDW denies the allegations contained in Paragraph No. 164.**

165.    Contour has been unable to recover approximately 15% of the Contour-created IT System and its Confidential Information and Trade Secrets.

**ANSWER: CDW denies that Contour has properly identified any legally protectible trade secrets and, thus, denies any such allegations contained in Paragraph No. 165.  CDW lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations contained in Paragraph No. 164 and, therefore, denies those allegations.**

166.    At no time did Contour consent to Gridforce, NAES, and/or CDW's theft and misappropriation of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 166, including that it participated in any theft or misappropriation of Contour's trade secrets.**

167.    Gridforce, NAES, and CDW had no lawful  justification  for the taking and destruction of 15% of the Contour-created IT System and Contour's Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 167, including that it participated in the taking or destruction of Contour's trade secrets.**

168.    By virtue of the foregoing, Contour has suffered and will continue to suffer the loss of its Confidential Information and Trade Secrets.

**ANSWER: CDW denies the allegations contained in Paragraph No. 168.**

169.    As a direct and proximate result of Gridforce, NAES, and CDW's conversion and/or negligent destruction of the Contour-created IT System and Contour's Confidential Information and Trade Secrets, Contour has suffered and continues to suffer monetary damages and irreparable harm.

**ANSWER: CDW denies the allegations contained in Paragraph No. 169.**

**COUNT V**
**FEDERAL COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq*.**
**(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)**

170.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER: CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.  Paragraph No. 170 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 170 is required.  To the extent an answer is required, CDW denies said allegations.**

171.    At all times relevant, Contour's computer systems and servers were connected to the internet and routinely used in interstate commerce. Contour also maintained its Confidential Information and Trade Secrets on its computer systems and servers. As such, Contour's computer system and servers constitute "protected computers" under 18 U.S.C. § 1030(e)(2).

**ANSWER: Paragraph No. 171 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 171**

is required.  In addition, Paragraph No. 171 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph No. 171 and, therefore, denies those allegations.  CDW denies the allegations in the second and third sentences of this Paragraph 171.

172.    Contour's Confidential Information and Trade Secrets were maintained in Contour's computer system and servers. Contour maintained and secured their computer systems and servers by reasonable means.

**ANSWER:  Paragraph No. 172 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 172 is required.  To the extent an answer is required, CDW denies said allegations.**

173.    Defendants agreed to access Contour's computer systems and servers without Contour's knowledge or authorization, causing loss.

**ANSWER:  Paragraph No. 173 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 173 is required.  To the extent an answer is required, CDW denies said allegations.**

174.    On information and belief, by their conduct, Defendants extracted the Contour-created IT System and Confidential Information and Trade Secrets and caused loss to Contour in violation of 18 U.S.C. § 1030(a)(2)(C) and 1030(a)(5)(C).

**ANSWER:  Paragraph No. 174 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 174 is required.  In addition, Paragraph No. 174 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies said allegations.**

175.     Defendants knowingly, willfully, and with intent, accessed Contour's computers and servers without Contour's authorization and obtained valuable information, that, on information and belief, Defendants used to obtain something of value in violation of 18 U.S.C. § 1030(a)(4).

**ANSWER:  Paragraph No. 175 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 175 is required.  In addition, Paragraph No. 175 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies said allegations.**

176.     As a direct result of Defendants' conduct, Contour has incurred reasonable costs to respond to Defendants' unauthorized access of its computer systems and servers, the theft of the Contour-created IT System and Confidential Information and Trade Secrets, and to conduct a damage assessment; and Contour has incurred other consequential damages and losses in the aggregate amount exceeding $5,000.

**ANSWER:  Paragraph No. 176 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 176 is required.  To the extent an answer is required, CDW denies said allegations.**

177.     Pursuant to 18 U.S.C. § 1030(g), Contour is entitled to recover from Defendants the damages Contour has suffered, as well as gains, profits, advantages, and unjust enrichment the Defendants have obtained as a result of their wrongful acts alleged herein. Contour is presently unable to ascertain the full extent of these damages, gains, profits, advantages, and unjust enrichment.

**ANSWER:  Paragraph No. 177 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 177**

is required.  In addition, Paragraph No. 177 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies said allegations.

178.    Furthermore, Contour has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate for injuries inflicted by the Defendants. Accordingly, Contour is entitled to injunctive relief.

**ANSWER:  Paragraph No. 178 is included in Count V, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 178 is required.  To the extent an answer is required, CDW denies said allegations.**

**COUNT VI**
**FEDERAL STORED COMMUNICATIONS ACT, 18 ,U.S.C. § 2701, *et seq*.**
**(GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)**

179.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER:  CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.  Paragraph No. 179 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 179 is required.  To the extent an answer is required, CDW denies said allegations.**

180.    The Stored Communications Act ("SCA") provides that any "aggrieved" party may bring a civil action against a defendant who "intentionally accesses without authorization" or "intentionally exceeds an authorizations to access" a "facility through which an electronic communication service is provided ... and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a)(l)-(2); *see§* 2707(a) (providing private right of action).

**ANSWER:  Paragraph No. 180 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 180**

is required.  In addition, Paragraph No. 180 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 180 quotes portions of the Stored Communications Act.  CDW denies any remaining allegations in this Paragraph No. 180.

181.   The SCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

**ANSWER:**  **Paragraph No. 181 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 181 is required.  In addition, Paragraph No. 181 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 181 quotes a portion of the Stored Communications Act.  CDW denies any remaining allegations in this Paragraph No. 181.**

182.   The SCA defines an "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." . 18 U.S.C. § 2510(15).

**ANSWER:**  **Paragraph No. 182 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 182 is required.  In addition, Paragraph No. 182 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 182 quotes a portion of the Stored Communications Act.  CDW denies any remaining allegations in this Paragraph No. 182.**

183.    The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof;" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

**ANSWER:  Paragraph No. 183 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 183 is required.  In addition, Paragraph No. 183 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 183 quotes portions of the Stored Communications Act.  CDW denies any remaining allegations in this Paragraph No. 183.**

184.    Contour provides authorized clients, among other things, the ability to transmit and receive "electronic communications" as defined by the SCA.

**ANSWER:  Paragraph No. 184 is included in Count VI, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 184 is required.  In addition, Paragraph No. 184 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies the allegations in this Paragraph No. 184.**

185.    Defendants intentionally accessed without authorization or intentionally exceeded authorization to access facilities through which an electronic communications services was provided and thereby obtained unauthorized access to Contour's stored electronic communications while in electronic storage - *i.e.,* when Defendants accessed Contour's computer systems and servers without Contour's authorization to "lift and shift" the Contour- created IT System and Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 185 is included in Count VI, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 185 is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 185.**

186.    By their illegal actions and conduct as alleged, Defendants caused damage to Contour, including but not limited to, theft of the Contour-created IT System and its Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 186 is included in Count VI, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 186 is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 186.**

187.    Contour was harmed by Defendants' violations, and pursuant to 18 U.S.C. § 2707(c). are entitled to actual damages, including profits earned by Defendants attributable to the violations or statutory minimum damages of $1,000 per person punitive damages, costs, and reasonable attorneys' fees.

**ANSWER: Paragraph No. 187 is included in Count VI, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 187 is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 187.**

### COUNT VII
### Texas Harmful Access by a Computer Act, Tex. Civ. Prac. & Rem. Code § 143.001 et seq.
### (GRIDFORCE, NAES, DOE DEFENDANTS, AND ABC DEFENDANTS)

188.    Contour repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER:  CDW repeats its responses to the preceding Paragraphs as if fully set forth herein.  Paragraph No. 188 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 188 is required.  To the extent an answer is required, CDW denies said allegations.**

189.    Texas Civil Practice and Remedies Code section 143,001 provides a civil action to "[a] person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . if the conduct constituting the violation was committed knowingly or intentionally."

**ANSWER:  Paragraph No. 189 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 189 is required.  In addition, Paragraph No. 189 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 189 quotes a portion of the Texas Civil Practice and Remedies Code.  CDW denies any remaining allegations in this Paragraph No. 189.**

190.    Texas Penal Code Section 33,02(a) makes it illegal to knowingly access another's "computer, computer network, or computer system without the consent of the owner."

**ANSWER: Paragraph No. 190 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 190 is required.  In addition, Paragraph No. 190 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW admits that this Paragraph No. 190 quotes a portion of the Texas Penal Code.  CDW denies any remaining allegations in this Paragraph No. 190.**

191.    Contour's computer systems and servers constitute a "computer," "computer network," and/or a "computer system" under <u>Texas Penal Code section 33,01(4)-(5)</u>, <u>(8)</u>.

**<u>ANSWER:</u>  Paragraph No. 191 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 191 is required.  In addition, Paragraph No. 191 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies the allegations in this Paragraph No. 191.**

192.    Defendants violated § 33.02(a) of the Texas Penal Code by knowingly accessing Contour's computer, computer network, or computer system without Contour's consent.

**<u>ANSWER:</u>  Paragraph No. 192 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 192 is required.  In addition, Paragraph No. 192 constitutes a legal conclusion, to which no response is required.  To the extent an answer is required, CDW denies the allegations in this Paragraph No. 192.**

193.    Defendants knowingly accessed Contour's protected computers, computer networks, and computer systems without effective consent. This knowing access without effective consent includes, CDW - at the direction of Gridforce and NAES - knowingly accessing, from its offices in Texas, Contour's computer systems and servers, based in Utah and Pennsylvania, without Contour's consent. Upon gaining unauthorized access, CDW - at the direction of Gridforce and NAES - "lifted and shifted" Contour's Confidential Information and Trade Secrets also without consent.

**<u>ANSWER:</u>  Paragraph No. 193 is included in Count VII, which does not contain a claim against CDW.  Accordingly, no response to the allegations contained in Paragraph No. 193**

is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 193.

194. As a direct result of this conduct, Contour suffered loss in expending time, money, and resources aggregating at least $5,000 in value, to investigate the intrusion, assess the damage, as well as the value of the Contour-created IT System and its Confidential Information and Trade Secrets.

**ANSWER: Paragraph No. 194 is included in Count VII, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 194 is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 194.**

195. Pursuant to Texas Civil Practice & Remedies Code § 143,001(b), Contour is entitled to recover from Defendants the damages Contour has suffered as result of their wrongful acts alleged herein.

**ANSWER: Paragraph No. 195 is included in Count VII, which does not contain a claim against CDW. Accordingly, no response to the allegations contained in Paragraph No. 195 is required. In addition, Paragraph No. 195 constitutes a legal conclusion, to which no response is required. To the extent an answer is required, CDW denies the allegations in this Paragraph No. 195.**

## AFFIRMATIVE AND OTHER DEFENSES

Pleading in the alternative, and without assuming burden of proof where it otherwise lies with the Plaintiff, CDW asserts the following affirmative defenses. CDW reserves the right to assert additional defenses of which CDW subsequently learns.

### First Affirmative Defense

Contour's claims are barred, in whole, because this Court lacks subject matter jurisdiction with respect to the claims Contour alleges against CDW.

### Second Affirmative Defense

Contour's claims are barred, in whole or in part, because the Complaint fails to state any claim upon which relief can be granted.

### Third Affirmative Defense

Contour's claims are barred, in whole, because Contour has failed to set forth facts sufficient to establish the legal elements to show trade secrets in Gridforce's former IT system.

### Fourth Affirmative Defense

Contour's claims are barred, in whole, because Gridforce had a right to possess and use any alleged trade secrets disclosed to CDW.

### Fifth Affirmative Defense

Contour's claims are barred, in whole or in part, based on an applicable statute of limitations.

### Sixth Affirmative Defense

Contour's claims are barred, in whole or in part, based on the doctrine of laches.

### Seventh Affirmative Defense

Contour's claims are barred, in whole or in part, based on the doctrine of consent, waiver, estoppel or acquiescence.

### Eighth Affirmative Defense

Contour's claims are barred, in whole or in part, based on the doctrine of unclean hands and other equitable defenses.

## Ninth Affirmative Defense

Contour's claims are barred, in whole or in part, based on the authorization and/or consent provided to CDW, and on CDW's reasonable understanding of that authorization and/or consent, to perform all acts associated with CDW's acts undertaken in furtherance of the data migration and/or other work for Gridforce.

## JURY DEMAND

CDW demands a trial by jury on all issues so triable.


Dated: December 22, 2021                    VEDDER PRICE P.C.


By: /s/ Thomas P. Cimino, Jr.
    Jeremiah J. Vandermark (SBN 317230)
    jvandermark@vedderprice.com
    1633 Broadway 31st Floor
    New York, New York 10019
    T: +1 212 407-7759

    Thomas P. Cimino, Jr. (*admitted pro hac vice*)
    222 North LaSalle Street
    Chicago, Illinois 60601
    T: +1 312 609 7500
    tcimino@vedderprice.com

    Joshua J. Orewiler (admitted *pro hac vice*)
    222 North LaSalle Street
    Chicago, Illinois  60601
    T: +1 312 609 7500
    jorewiler@vedderprice.com

    Attorneys for Defendant
    CDW Corporation and CDW Direct, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2021, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system and that all counsel of record will be served via the Notice of Electronic Filing generated by CM/ECF.

Dated December 22, 2021

/s/ Thomas P. Cimino, Jr.
Thomas P. Cimino, Jr.